Louis J. Fox and Dorothy C. Fox, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 17931–81, 15520–82.     Filed June 25, 1984.

*Laurence Goldfein, Richard A. Levine, Barbara T. Kaplan,* and *Peter A. Glicklich,* for the petitioners.

*Theodore J. Kletnick, Cynthia J. Mattson, Vincent R. Barrella,* and *Gary Kirschenbuum,* for the respondent.

Nims, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1977 | $19,629 |
| 1978 | 3,906 |
| 1979 | 18,236 |

After concessions, the sole issue remaining for decision is whether petitioners are entitled to deduct certain losses under

section 165(c)(2).[1] These losses were realized on the disposition of purchased put options tied to specific U.S. Treasury bills (Treasury bills). The options positions in each instance represented half of so-called vertical put spread positions held by petitioners straddling the years in issue and 1980.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Louis J. Fox (Fox or petitioner) and Dorothy C. Fox, husband and wife, resided in Harrison, N.Y., at the time the petitions in this case were filed.

During the years 1977 through 1980, Fox engaged in three sets of options transactions which resulted in the losses disputed here. The transactions were in over-the-counter options on specific U.S. Treasury bills. The market in which these trades were executed was unique and was created and administered by a brokerage firm known as Arbitrage Management.[2] The market will be described in detail later in these findings.

All of the petitioner's transactions were in put options, which are options to sell an underlying security at a particular price, on or before a particular date. All of petitioner's transactions in put options were structured to establish positions known as vertical put spreads. A spread is a hedged position comprised of two substantially offsetting options positions. With a given change in the price of the underlying security, one option will appreciate in value while the other option will depreciate in value. The spread is ordinarily composed of one "long leg"—a purchased option—and one "short leg"—a sold (or granted)[3] option. A vertical spread is a

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated. All references to Rules are to the Tax Court Rules of Practice and Procedure, except as noted.

[2] The market was established by Arbitrage Management when it was still a division of Hoppin, Watson, Inc., a brokerage firm. In December 1977, Hoppin, Watson, Inc., was acquired by another brokerage firm, Janney, Montgomery, Scott, Inc. In March 1978, Arbitrage established itself as a separate firm. Arbitrage Management Division of Hoppin, Watson, Inc., Arbitrage Management Division of Janney, Montgomery, Scott, Inc., Arbitrage Management Investment Co., and Arbitrage Management Co. will be referred to collectively as Arbitrage Management.

[3] An option originates when an individual known as the grantor writes a contract giving the holder the right to buy or sell a specified asset at a specified price, on or before a specified date. Because the grantor receives consideration from the buyer for writing the option, the grantor is

spread comprised of two options with the same expiration date but different strike prices.[4]

Petitioner engaged in three sets of transactions establishing vertical put spreads. The details and chronology of these transactions are set out in table I on page 1006. Because the transactions are thoroughly described in table I, only a brief textual synopsis will be provided below.

In the first set of transactions, Fox initiated nine vertical put spreads, opening the spreads on December 7, 1977, and closing out[5] the spreads on December 30, 1977. Because petitioner's positions in theory wagered against rises in the price of the underlying security, i.e., Treasury bills, these positions are known as bearish spreads.

The second set of transactions, straddling the years 1978 and 1979, was slightly more complex. Fox established two vertical put spreads on November 22, 1978. Instead of closing out the spreads in the next transactions, however, Fox executed so-called switches on December 28, 1978. In a switch, only one leg of the spread is closed out and a new leg is then substituted to create a different spread. In this case, Fox broadened the original spreads by substituting options with a strike price of 97.8125 for the initial long positions having a strike price of 97.75. The short leg of the spread remained in place with a strike price of 97.625. Both the initial and the post-switch spreads were bearish vertical put spreads. The spreads were closed out on January 23, 1979.

---

often also referred to as the seller of the option. Accordingly, the terms "seller," "writer," and "grantor" are used interchangeably in this connection.

The term "seller" may, however, be used with a different meaning in one instance. An individual may sell an option in order to close out a previously established long position, as opposed to initiating a new position. This usage of the term "seller" should be evident from the context.

[4]The strike price of an option is the price at which the underlying security would be bought or sold if the option were exercised. This term is to be distinguished from the price of the option, itself, which is called the "premium."

[5]An option position may be closed out in any of three ways. One method is exercise of the option. If a put option is exercised, the seller (or grantor) of the option is then obligated to purchase the underlying security (e.g., Treasury bill) from the option purchaser at the strike price.

A second method is simply to permit the option to expire unexercised and unsold, in which case it is said to "lapse."

A third method is a closing sale or closing purchase transaction. In this case, the option holder purchases or sells an identical option which exactly offsets, and in effect liquidates, his original position.

In this opinion, the term "close out" will refer to closing purchase or sale transactions, unless otherwise indicated. None of Fox's positions were ever terminated by exercise or lapse.

The third and final set of transactions, straddling the years 1979 and 1980, also involved switches but with a different result. Specifically, Fox established three executed switches on December 17, 1979. The resulting spreads were bullish spreads, in theory designed to capitalize on increases in the price of the underlying Treasury bills. Fox closed out these positions on January 7, 1980.

Petitioner sustained net economic losses on each of the three sets of transactions described above. After commissions, his loss on the first set of transactions (1977) was $1,395; on the second set of transactions (1978–79), $386; and on the third set (1979–80), $843.

Petitioner reported ordinary losses[6] and short-term capital gains for the years in issue and 1980 as follows, treating the dispositions of individual legs of the spreads as separate taxable events:

| Year[7] | | Ordinary loss | Short-term capital gain |
|------|-------|-----------|-----------|
| 1977 | | $45,720 | - - - |
| 1978 | | 15,802 | $44,325 |
| 1979 | | 45,837 | 29,558 |
| 1980 | | 30,144 | 60,996 |
| | Total | 137,503 | 134,879 |

All of petitioner's reported losses were realized on the disposition of the "long" legs of his spreads, i.e., the purchased options. These losses were calculated as follows :

| Year of loss | 1977 | 1978 | 1979 | 1979 | 1980 |
|--------------|------|------|------|------|------|
| Option (identified by strike price) | 99.20 | 97.75 | 97.8125 | 97.20 | 97.02 |

---

[6]Petitioner reported losses as ordinary losses pursuant to sec. 1234(a)(1), which provides that the character of the gain or loss on the sale or exchange of a purchased (i.e., "long") option is the same as the character of the gain or loss on the sale of the property to which the option relates. The property to which petitioner's options related was Treasury bills. Treasury bills were, during the years in issue here, specifically excluded from the definition of a capital asset by sec. 1221(5). Accordingly, petitioner reported these losses as ordinary losses.

The Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 331, repealed sec. 1221(5) as to obligations acquired after June 23, 1981, and subjected short-term governmental obligations to new sec. 1232(a)(3) (now sec. 1232(a)(4)). This change eliminated the possibility of reporting ordinary losses on the disposition of options relating to Treasury bills.

[7]It was stipulated that petitioner incorrectly reported losses for 1977 and gains and losses for 1979, and that the correct amounts should have been as set out above.

| Year of loss | 1977 | 1978 | 1979 | 1979 | 1980 |
|---|---|---|---|---|---|
| Date of opening transaction (purchase) | 12/7/77 | 11/22/78 | 12/28/78 | 11/15/79 | 12/17/79 |
| Net cost | ($88,335) | ($67,126) | ($52,670) | ($153,093) | ($119,631) |
| Date of closing transaction (sale) | 12/30/77 | 12/28/78 | 1/23/79 | 12/17/79 | 1/7/80 |
| Net proceeds | $42,615 | $51,324 | $38,528 | $121,398 | $89,487 |
| Amount of loss | ($45,720) | ($15,802) | ($14,142) | ($31,695) | ($30,144) |

All of petitioner's reported short-term capital gains were realized on the disposition of the "short" legs[8] of his spreads, i.e., the granted options. These gains were calculated as follows:

| Year of gain: | 1978 | 1979 | 1980 |
|---|---|---|---|
| Option (identified by strike price | 99.10 | 97.625 | 97.08 |
| Date of opening transaction (grant) | 12/7/77 | 11/22/78 | 11/15/79 |
| Net proceeds | $80,415 | $65,724 | $151,527 |
| Date of closing transaction (purchase) | 12/30/77 | 1/23/79 | 1/7/80 |
| Net cost | ($36,090) | ($36,166) | ($90,531) |
| Amount of gain | $44,325 | $29,558 | $60,996 |

On three occasions, petitioner was required to make payments to a margin account in connection with these trades. He made these payments in the following amounts on the following days:

| Date of check | Amount |
|---|---|
| Dec.  7, 1977 | $15,000 |
| Dec.  6, 1978 | 1,800 |
| Nov. 12, 1979 | 5,750 |

After his transactions were completed, petitioner's losses and commissions were deducted from his margin deposit and the remainder was refunded to him.

---

[8]Sec. 1234(b) prescribes that the character of the gain or loss recognized on the closing out of *granted* options will be short-term capital gain or loss. Had petitioner realized losses on the short legs of his spreads, he would have had to report capital losses.

TABLE I

| Transaction date | Transaction | Option expiration date | Strike price | T-bill market price | Premium before commission | Commission | Net (cost); net proceeds | Net |
|---|---|---|---|---|---|---|---|---|
| 12/ 7/77 | Purchased 9 puts | 1/16/78 | 99.20 | 99.309 | 0.9775 | $360 | ($88,335) | ($7,920) |
| 12/ 7/77 | Wrote 9 puts | 1/16/78 | 99.10 | | 0.8975 | 360 | 80,415 | |
| 12/30/77 | Sold 9 puts | 1/16/78 | 99.20 | 98.714 | 0.4775 | 360 | 42,615 | 6,525 |
| 12/30/77 | Purchased 9 puts | 1/16/78 | 99.10 | | 0.3970 | 360 | (36,090) | |
| 11/22/78 | Purchased 2 puts | 3/28/79 | 97.75 | 94.552 | 3.3503 | 120 | (67,126) | (1,402) |
| 11/22/78 | Wrote 2 puts | 3/28/79 | 97.625 | | 3.2922 | 120 | 65,724 | |
| 12/28/78 | Sold 2 puts | 3/28/79 | 97.75 | 95.280 | 2.6275 | 120 | 51,324 | (1,346) |
| 12/28/78 | Purchased 2 puts | 3/28/79 | 97.8125 | | 2.5722 | 120 | (52,670) | |
| 1/23/79 | Purchased 2 puts | 3/28/79 | 97.625 | 95.940 | 1.9334 | 140 | (36,166) | 2,362 |
| 1/23/79 | Sold 2 puts | 3/28/79 | 97.8125 | | 1.8013 | 140 | 38,528 | |
| 11/15/79 | Purchased 3 puts | 3/26/80 | 97.20 | 92.816 | 5.0981 | 150 | (153,093) | (1,566) |
| 11/15/79 | Wrote 3 puts | 3/26/80 | 97.08 | | 5.0559 | 150 | 151,527 | |
| 12/17/79 | Sold 3 puts | 3/26/80 | 97.20 | 93.788 | 4.0516 | 150 | 121,398 | 1,767 |
| 12/17/79 | Purchased 3 puts | 3/26/80 | 97.02 | | 3.9827 | 150 | (119,631) | |
| 1/ 7/80 | Purchased 3 puts | 3/26/80 | 97.08 | 94.470 | 3.0127 | 150 | (90,531) | (1,044) |
| 1/ 7/80 | Sold 3 puts | 3/26/80 | 97.02 | | 2.9879 | 150 | 89,487 | |

Note: Maturity dates of the specific underlying Treasury bills for each of the three sets of transactions were as follows:

1977        : Mar. 16, 1978
1978–79: June 26, 1979
1979–80: June 24, 1980

The market in which petitioner executed these trades was unique and specialized. Options are traded either on organized exchanges ("listed options") or through broker-dealers making a market ("over-the-counter options"). Over-the-counter markets are often forerunners of organized exchanges. The first organized exchange was the Chicago Board of Options Exchange, established in 1974, and until 1980, it traded only in stock options.

The options traded through Arbitrage Management were tied to specific U.S. Treasury bills. Treasury bills are obligations of the United States which are periodically issued and auctioned by the Treasury in denominations of up to $1 million and have specified maturities of up to 1 year. Treasury bills are discount instruments, which means that they are issued and sold for less than their maturity or face values. The amount of the discount reflects the time value of the money paid for the Treasury bill. Accordingly, the price of newly issued Treasury bills will vary inversely with prevailing interest rates.

The price of a *specific* Treasury bill will, however, be subject to a phenomenon sometimes referred to as "gravitational pull." Even if interest rates remain the same, the price of a Treasury bill will nonetheless rise as the bill's maturity date approaches, when it will be redeemed at face value. Thus, a dramatic increase in interest rates must occur for a Treasury bill's price to fall; overcoming the gravitational pull effect. Petitioner's expert witness estimated that the probability of interest rates increasing sufficiently to overcome the upward drift of Treasury bill prices 1 day after the spreads were initiated was between 10 and 30 percent.

The effect of gravitational pull becomes more powerful as the maturity date of a Treasury bill draws closer, requiring a larger and larger increase in interest rates before the price may decline. The probability of interest rates increasing sufficiently to overcome gravitational pull diminishes at an accelerating pace as the options period elapses.

Tying options to specific Treasury bills was unusual because of this feature of gravitational pull. Each option was tied to a specific Treasury bill maturing on a specific date either 60 or 90 days after the expiration date of the option. The value of each long position in petitioner's spreads was therefore pre-

dictably subject to erosion because of the effects of gravitational pull.[9]

In 1982, a different market in Treasury bill options was established by the American Stock Exchange (AMEX). This market was designed to exclude the effects of gravitational pull. Rather than tying the options to specific Treasury bills, AMEX related the options to a constantly changing set of Treasury bills, always having a maturity date of 90 days hence.

The Arbitrage Management market was characterized by other features unusual for options markets, generally. The market traded only in put options while in other markets call options represent 95 percent of options trading. This was explained by Arbitrage Management as a means of accommodating the natural perspective of investors; because of the inverse relationship of interest rates and Treasury bill prices, a put option on prices was equivalent to a call option on interest rates, permitting purchasers to view their purchases as "wagers" that interest rates would rise.

More specifically, the Arbitrage Management market traded only in vertical put option spreads. This specialization is unprecedented among options markets.

All of the Treasury bill options were "in-the-money" options. The cost of an option (its premium) is generally said to be composed of two components called intrinsic value and time value. The intrinsic value of an option is the difference between the option's strike price and the current market price of the underlying security. The time value of an option is the additional value that a buyer is willing to pay for the option, usually a reflection of factors such as the time until expiration of the option and the volatility of the price of the underlying security. A put option with an intrinsic value greater than zero is referred to as an "in-the-money" option. An "in-the-money" put option has a strike price greater than the market price of the underlying security.

In contrast, an "at-the-money" put option is an option with a strike price approximately equal to the market price of the underlying security. The premium of an option priced "at-the-money" generally will consist mainly of time value. In mar-

---

[9]The long position is the purchased put option. The value of the purchased put option will decrease if the price of the Treasury bill rises.

kets other than the one administered by Arbitrage Management, options rarely trade at other than "at-the-money."

Trading by customers of Arbitrage Management in over-the-counter Treasury bill options displayed distinct patterns. First, trading was markedly seasonal. The bulk of all trades were executed in November, December, and then in January of the following year.

Second, customers of Arbitrage Management commonly engaged in identical trading sequences. During the years 1978 through 1980, most of the customers establishing the same spread positions as petitioner on the same day as petitioner went on to execute identical switch transactions on the same day before yearend, and identical closing transactions on the same day in the following January. The same was true of customers establishing spread positions opposite[10] that of petitioner. A comparative summary of customers initiating spreads on the same day as petitioner is as follows:

| | Number of customers trading identical sequence | Number of customers trading different sequence | Number of customers for which information was insufficient |
|---|---|---|---|
| 1978–79: same spread initiated | 39 | 1 | 3 |
| 1978–79: opposite spread initiated | 19 | 0 | 5 |
| 1979–80: same spread initiated | 61 | [11]7 | 10 |
| 1979–80: opposite spread initiated | 65 | 0 | 5 |

Block trading ordinarily might account for some identity of trades within groups of customers, but it is an implausible explanation for the degree of identity reflected in the table above.

Finally, very few customers realized net economic profits on their transactions in vertical put option spreads. During Arbitrage Management's first month of trading over-the-

---

[10]Customers establishing spreads opposite to petitioner purchased the same options that petitioner sold, and sold the same options that petitioner purchased.

[11]These seven customers executed switches and closed out their spreads on the same day as petitioner did. The trading pattern differed in that their switch transactions resulted in different vertical put spreads. All seven customers executed the same trades on the same dates.

counter Treasury bill options—December 1977—it had 54 customers. Of the 50 customers for which information was available, 49 customers sustained net economic losses and one customer realized a net economic profit. The one customer who realized a profit was, for some unexplained reason, charged a commission of only $1 per option contract, in contrast to the ordinary charge of $40 per contract.

In following years, the results were similar. Of 175 customers for which information was available, 166 sustained net economic losses on their spread transactions straddling the years 1978 and 1979. Of 376 customers for which there was information in the record, 366 sustained net economic losses on their spread transactions straddling the years 1979 and 1980.

When Arbitrage Management first initiated its trading in Treasury bill options, it had the transactions clear through Pershing & Co. (Pershing). The clearing firm serves a dual purpose. First, it serves an accounting function, processing executed trades, balancing the books, and settling the trades. Second, the clearing firm also acts as the endorser of the option contracts it clears, guaranteeing their performance.

Pershing cleared the Treasury bill options transactions executed by Arbitrage Management until the fall of 1979. At that time, Arbitrage Management itself began to clear the Treasury bill options transactions because Pershing was experiencing difficulties in doing so. The difficulties stemmed from the unusual features of these options, such as the very large premiums, which the Pershing processing system was unequipped to accommodate. Ultimately, Arbitrage Management formed a separate corporation, Arbitrage Clearing Corp., to clear the trades.

Beginning in 1978, the Treasury bill options market was characterized by cross trading, that is, Arbitrage Management executed trades between and among its own customers. Customers on opposite sides of transactions were not, however, matched to each other. Pershing, and later Arbitrage Management, merely held on file blank option contracts for delivery upon request.

Prices of particular Treasury bill options generally were not negotiated, but rather were accepted as suggested by a computer pricing model operated by Arbitrage Management.

Accordingly, customers trading the same options ordinarily paid or received identical premiums.

The computer model determined premiums after evaluation of a number of factors. The starting point was Treasury bill futures prices from which the future interest rate expected by the market could be derived. This expected future interest rate in turn enabled an estimate to be made of a particular Treasury bill's price as of the expiration date of its associated option.

The estimated price of the Treasury bill as of the option expiration date then was used as a benchmark by which strike prices were selected for the options. Thus, the options were designed to be approximately "at-the-money" at expiration. Once strike prices were selected, the intrinsic value of each option was measurable by reference to the current market price of the underlying Treasury bill.

A time value was then determined and added to the intrinsic value to produce the total suggested premium. The time value was calculated by reference to current and expected interest rates and to a volatility factor which estimated the tendency of Treasury bill prices to change.

The pricing model determined suggested premiums without regard to the phenomenon of gravitational pull. Options models necessarily assume that the price of the underlying asset varies according to a log-normal distribution, with the expected price at expiration equal to the current price. This is not true for Treasury bill prices because of the gravitational pull effect. Arbitrage Management's computer model therefore did not employ a price distribution to determine premiums but rather employed an interest rate distribution which was not subject to the distortion of gravitational pull.

Arbitrage Management became a member of the National Association of Securities Dealers (NASD) in July 1978. In March 1980, a NASD investigator conducted a routine examination and review of Arbitrage Management's activities. The investigator reviewed the firm's records and interviewed the firm's registered principals. In his background report on Arbitrage Management, the investigator summarized his review of Treasury bill options trading as follows:

*OTC Option Trading.* The staff reviewed this customer activity for a two month period (Jan./Feb. 1980) and noted that there did not appear to be any

(

rule violations. As noted in prior examinations, the firm does not reveal the formula it devised and now uses for determining premium costs. Consequently, the staff cannot determine if they are fair and reasonable, at all times and how their direct relationship to changes in the costs of the underlying securities. [sic] Third party professionals are authorized to do the trading in the bulk of these accounts, thereby further supporting the suitability of this trading activity for customers who are in higher tax brackets and interested only in tax advantages.

In another part of the same report, the investigator noted: "Most of these public customers are introduced to AMIC by outside investment advisors and tax experts who have authorization to trade these AMIC accounts."

Petitioner first learned of Arbitrage Management's activities through a tax attorney employed at J. Aron & Co. where petitioner was also employed. J. Aron & Co. is a dealer in precious metals, coffee, and foreign currency. Petitioner's responsibilities at J. Aron & Co. were to purchase and sell precious metals and to structure the financing and hedging transactions associated with those trades. His work required him to be well informed about interest rates and their trends.

Petitioner was referred to Jon Edelman (Edelman) at Arbitrage Management for more information. Petitioner and Edelman arranged a meeting which took place at Edelman's office some time in the fall of 1977. Edelman outlined the Treasury bill options program for petitioner, explaining the tax benefits, economic risks and rewards, and structure of the trading.

Petitioner then requested Arthur Bell (Bell), his accountant and tax adviser, to speak with Edelman, gather more information, and evaluate the options program. Bell complied; he had discussions with Edelman, he investigated the tax benefits of the program, and then he reported to petitioner.

Bell learned that because of the feature of gravitational pull, petitioner would foreseeably realize losses on the purchased options in the spreads. Bell received no promotional material from Arbitrage Management but acquired a letter explaining the tax treatment of the Treasury bill options transactions.

After talking with Bell, Fox decided to undertake the trades. In answer to an interrogatory submitted by respondent, petitioner explained his decision to undertake the trades as follows: "I entered into these transactions in order to derive an

economic profit and to take advantage of favorable tax benefits associated with such transactions."

Petitioner closed out options positions on December 30, 1977, December 28, 1978, and December 17, 1979, in order to realize losses for tax purposes.

The maximum profit potential and maximum loss potential of a particular vertical option spread is always readily quantifiable. The maximum loss on a spread will be the difference between the premiums paid and received plus commissions. The maximum profit will be the difference between the strike prices, less the net premiums paid, less commissions.

The profit and loss potential of each of petitioner's spread positions, after commissions, is set out in the table below:

| Transaction date | Maximum gain | | Maximum loss | | Actual result | |
|---|---|---|---|---|---|---|
| | Per spread | Total | Per spread | Total | Per spread | Total |
| 12/07/77 | 40 | 360 | (960) | (8640) | (155) | (1395) |
| 11/22/78 | 429 | 858 | (821) | (1642) | (193) | (386) |
| 12/28/78 (switch) | 386 | 722 | (1494) | (2748) | | |
| 11/15/79 | 578 | 1734 | (622) | (1866) | (281) | (843) |
| 12/17/79 (switch) | (33) | (99) | (633) | (1599) | | |

The profit and loss parameters summarized above are determined on the assumption that the options in the spread are held to expiration.

For example, the maximum gain to be realized on petitioner's 1977 spreads (before commissions) would be realized only if the market price of the underlying Treasury bill were less than the lower strike price of the spreads (99.1) at the expiration date of the options (January 16, 1978). The maximum loss (before commissions) would be sustained if the market price of the Treasury bill were higher than the higher strike price of the spreads (99.2) at the expiration date of the options.

Before commissions, the distribution of potential gains and losses may be graphically depicted as follows:

P = T-bill market price at expiration of options.

There will exist a break-even price for the Treasury bill as of the option's expiration date which will result in no gain or loss on the spreads. After commissions are accounted for, the break-even price becomes 99.10 instead of 99.12 as shown on the graph above. The Treasury bill market price on December 7, 1977, when petitioner initiated his first spreads, was 98.31. Accordingly, petitioner's 1977 transactions were in effect a wager that the Treasury bill price would not rise from 98.31 to above 99.1 by the expiration date of the options, notwithstanding the influence of gravitational pull.

Arbitrage Management's trading in Treasury bill options became insignificant after 1981.

OPINION

Petitioner's transactions illustrate a prototypical use of tax straddling to achieve deferral of income from year to year.

Over the course of 4 years, petitioner engaged in three sets of yearend options transactions which subjected him to minor economic risk and yet brought him, in theory, very large ordinary loss deductions.

Petitioner achieved this favorable effect by entering into substantially offsetting options positions, together known as vertical put spreads. In November or December of each of the years in issue here, petitioner purchased a number of put options tied to specific U.S. Treasury bills. The value of these

put options would decline as the price of the underlying Treasury bill rose.

Simultaneously, petitioner granted an equal number of nearly identical put options tied to the same Treasury bills. The value of these positions would increase as the price of the Treasury bill rose.

The result of these simultaneous transactions was the establishment of spread positions.

The maximum loss that petitioner could sustain from a particular spread was the difference between the premiums paid for the purchased options (the long leg of the spread) and the premiums received for the granted options (the short leg of the spread), plus commissions costs. The difference in the premiums paid and received was relatively small and existed because the options comprising each leg of the spread differed in their strike prices.

The average risk to petitioner on each set of spread positions was approximately $3,300. The actual aggregate economic loss sustained by petitioner over 4 years was $2,624. In contrast, the average yearly ordinary loss deduction theoretically generated by these transactions over 4 years was $34,375. The total losses claimed for the 4 years amounted to $137,503.

Under the Internal Revenue Code as in effect at the time, ordinary losses on these Treasury bill options transactions were available only from disposition of the *purchased* options in the spreads. Section 1234(a)(1) provides that the character of the gain or loss on the sale of a purchased (i.e., long) option will be the same as the character of the gain or loss on the sale of the property to which the option relates.[12] The property to which petitioner's options related was Treasury bills, which, during the years in issue here, were specifically excluded from the definition of a capital asset by section

---

[12]Sec. 1234(a) provides:

SEC. 1234. OPTIONS TO BUY OR SELL.

   (a) TREATMENT OF GAIN OR LOSS IN THE CASE OF THE PURCHASER.—

      (1) GENERAL RULE—Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

1221(5).[13] Accordingly, petitioner reported the losses on the disposition of his purchased options as ordinary losses.

Section 1234(b)(1), in contrast, prescribes the treatment to be accorded the disposition of *granted* options. That section provides that the character of such gain or loss will be short-term capital gain or loss, regardless of the nature of the underlying property.[14]

The choice of specific Treasury bills as the property underlying the options ensured that losses would be incurred only on the purchased options and thus be ordinary. A Treasury bill is a discount instrument, which means that it is issued and sold for less than its maturity value. Because the Treasury bill will be worth its face value at maturity, the price of the bill will necessarily rise to that face value as time passes and the maturity date approaches.

This tendency of a Treasury bill's price to inexorably rise is sometimes referred to as gravitational pull. The purchase of a put option on a Treasury bill is essentially a position defying this gravitational pull effect. A purchased put option will steadily lose value as the Treasury bill's price rises.

Petitioner, as expected, realized losses on only the purchased options in his spreads, and he reported these losses as ordinary losses. He then realized a corresponding short-term capital gain in the following year on the disposition of the granted options positions making up the opposing legs of the spreads.

Later in the year, petitioner established new spread positions and thereby achieved a continuing deferral of income for

---

[13]During the years in issue, sec. 1221(5) provided:

SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\*      \*      \*      \*      \*      \*      \*

(5) an obligation of the United States or any of its possessions, or of a State or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue; \* \* \*

[14]During the years in issue, sec. 1234(b)(1) provided:

SECTION 1234. OPTIONS TO BUY OR SELL.

(b) TREATMENT OF GRANTOR OF OPTION IN THE CASE OF STOCK, SECURITIES, OR COMMODITIES.—

(1) GENERAL RULE—In the case of the grantor of the option, gain or loss from any closing transaction with respect to, and gain on lapse of, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than [9 months for taxable years beginning in 1977; 1 year for taxable years beginning after December 31, 1977].

4 years. In practical effect, petitioner obtained a substantial interest-free loan from the public fisc for a 4-year period.

Petitioner executed these transactions in an over-the-counter market initiated and administered by a brokerage firm known as Arbitrage Management. He was directed to Arbitrage Management by a tax attorney who worked with him, and he entered into these transactions only after his accountant and tax adviser, Arthur Bell, had investigated their tax benefits.

The bulk of trading in Treasury bill options occurred in November, December, and January. Customers of Arbitrage Management commonly engaged in identical trading sequences, paying identical prices, and initiating, switching, and closing out options positions on identical days. Very few customers realized net economic profits after commissions. Most of the trading was between and among customers of Arbitrage Management.

Trading in Treasury bill options through Arbitrage Management became insignificant after 1981. In 1981, Congress acted to eliminate the possibility of reporting ordinary losses on the sale of options related to Treasury bills. See note 6 *supra*. The explanation accompanying the legislation noted that "Congress was concerned about the adverse impact of Treasury bill straddles on Government tax revenues." Staff of Joint Comm. on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Tax Act of 1981, at 309 (1981).

The apparently favorable consequences of tax straddling in general were specifically eliminated by direct congressional action in 1981. See sec. 1092. In essence, Congress denied loss deductions from tax straddles except to the extent that such losses exceed unrealized gains on the offsetting positions comprising the straddle. The Conference report summarized the legislation as follows:

> In the case of straddles involving property other than futures which are marked-to-market, the Senate amendment allows straddle losses only to the extent such losses exceed the unrealized gains on offsetting positions. Disallowed losses are deferred. The wash sale and short sale principles of present law are extended to straddles by regulation. The loss deferral rule applies to actively-traded personal property (other than stock). * * * [H. Rept. 97–215, at 258 (1981), 1981–2 C.B. 513.]

In this case, we are faced with determining whether tax straddle losses realized prior to this specific legislative solution should be disallowed under the provisions of the Internal Revenue Code as in effect during the years in question. The losses claimed by petitioner, while they may be characterized under section 1234 as recognized losses, are not necessarily therefore deductible under section 165(c)(2). See *Brown v. United States*, 184 Ct. Cl. 410, 396 F.2d 459, 465 (1968).

Respondent challenges petitioner's loss deductions on a plethora of grounds: (1) The options transactions were shams; (2) the options transactions were without economic substance; (3) the options transactions were not entered into for profit; (4) the individual legs of the options spreads should be integrated on a step-transaction or quasi-wash-sale theory; (5) the losses and gains from the individual legs should be recognized in the same taxable year in order to properly reflect income pursuant to section 446(b); or (6) the deductions are limited by section 465 to the relatively small amounts at risk in these transactions taken together.[15]

Petitioner seeks to deduct his losses under section 165(c)(2) which permits individuals to deduct "losses incurred in any transaction entered into for profit, though not connected with a trade or business." This statutory language is amplified by section 1.165–1(b), Income Tax Regs., as follows:

To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

The adjuration that substance must control over form compels us to view the relevant "transactions" in this case as petitioner's spread positions, and not merely the losing legs of

---

[15]The parties also raised a minor collateral issue for our decision. The gain of $44,325 reported by petitioner in 1978 related to an option position closed out on Dec. 30, 1977. The gain was reported in 1978 because the settlement date for the transaction fell on Jan. 3, 1978. This occurred despite the clearing firm's usual practice of using the same date for the trade and settlement date. Petitioner's witness, a supervisor at the clearing firm, speculated that the difference in dates might have been due to a computer error.

Respondent challenges the reporting of this gain in 1978 and contends that it should have been reported in 1977. Petitioner informs us that the deficiencies asserted herein would be unchanged were the gain to be reported in 1977, because of his capital loss carryovers for that year.

Petitioner's witness conceded that the delayed settlement date was not the clearing firm's usual practice and was probably an error. We hold that the gain should properly be reported in 1977.

the spreads. See *Nicolazzi v. Commissioner*, 79 T.C. 109, 130–131 (1982), affd. 722 F.2d 324 (6th Cir. 1983); *Smith v. Commissioner*, 78 T.C. 350, 390–391 (1982).

We hold that petitioner did not enter into these transactions primarily for profit, nor were the transactions a type of tax-motivated transaction which Congress intended to encourage, and therefore petitioner is not entitled to deduct his losses. Accordingly, we do not find it necessary to address respondent's alternative arguments.[16]

Petitioner argues that the existence of some profit motive is sufficient to support a loss deduction under section 165(c)(2). Petitioner contends that a loss deduction should be disallowed under that section only if a taxpayer's motive in entering the transactions is *solely* attributable to tax reasons.

Respondent argues that the options transactions at issue here cannot give rise to deductible losses because the transactions were not entered into primarily for profit. He asserts that petitioner's motive was either entirely or primarily tax reasons.

The language of section 165(c)(2) does not specify the degree of profit motive necessary to support a section 165(c)(2) loss deduction. An incidental profit motive is insufficient. *Ewing v. Commissioner*, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). At the other extreme, it requires no citation of authority to state as well that profit need not be the sole motive.

When a taxpayer enters a particular transaction with the mixed motives of obtaining a profit and obtaining tax benefits, the question exists whether profit motive must be the primary motive to satisfy section 165(c)(2), or whether the profit motive may be merely significant or substantial. For the purposes of this case, we proceed on the supposition, without deciding, that petitioner had some profit motive.

The "primary" standard first appeared as a judicial gloss on the statutory language of section 165(c)(2) in *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938). The case was unrelated to section 165(c)(2) and the reference to section 23(e) (predecessor to section 165(c)(2)) was made in order to support

---

[16]We do, however, refer respondent to our opinion in *Smith v. Commissioner*, 78 T.C. 350 (1982). Our treatment of respondent's "integration" arguments in that case would be equally appropriate here. 78 T.C. at 385–390.

the proposition that "The instances are many in which purpose or state of mind determines the incidence of an income tax." 304 U.S. at 289. In a footnote, the Court cited examples and included the following sentence: "Similarly, the deductibility of losses under section 23(e) * * * may depend upon whether the taxpayer's motive in entering into the transaction was primarily profit." (304 U.S. at 289 n. 5.)

Despite its rather casual genesis, the "primary" standard was echoed by a number of courts subsequently faced with cases under section 165(c)(2). In *Austin v. Commissioner*, 298 F.2d 583 (2d Cir. 1962), affg. 35 T.C. 221 (1960), the Second Circuit reiterated the standard as follows:

Petitioners contend that, since the word "primarily" does not appear in the statute, and since the Tax Court found that the transaction was entered into for profit, the deduction must be allowed. * * *

But the position for which petitioners contend would not provide a workable interpretation of sec. 165. * * * In Helvering v. National Grocery Co., 304 U.S. 282, 289 note 5, 58 S.Ct. 932, 936, 82 L.Ed. 1346 (1938), the Supreme Court said: "[T]he deductibility of losses under [sec. 165(c)] may depend upon whether the taxpayers' motive in entering the transaction was primarily profit." *This court has repeatedly held that, in determining the deductibility of a loss, the primary motive must be ascertained and given effect.* * * * [298 F.2d at 584; fn. refs. omitted; emphasis added.][17]

See also *King v. United States*, 545 F.2d 700, 708 (10th Cir. 1976); *Ewing v. Commissioner*, 20 T.C. at 233; *Wier v. Commissioner*, 109 F.2d 996, 998 (3d Cir. 1940).

In *Knetsch v. United States*, 172 Ct. Cl. 378, 348 F.2d 932 (1965), the Court of Claims expressed the same idea in a case involving mixed motives of profit and tax under section 165(c)(2):

The Supreme Court has said that the determinative question is whether the taxpayer's purpose in entering into the transaction was primarily for profit. *Helvering v. National Grocery Co.* * * *

\*    \*    \*    \*    \*    \*    \*

It appears that the dominant intent or motive here was the tax advantage sought to be derived from the deductibility of the purported interest. A secondary purpose would be that the taxpayers in purchasing these annuity

---

[17]Petitioner seeks to distinguish this, and other cases to the same effect, by emphasizing that the mixed motives at issue were personal and profit and not tax and profit. We disagree that this is a significant distinction.

contracts intended to provide for retirement income. * * * [348 F.2d at 936-937.]

Cf. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984) (sec. 183 profit motive); *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981) (sec. 162 profit motive); *Lemmen v. Commissioner*, 77 T.C. 1326, 1340–1341 (1981) (secs. 212, 167, 162 profit motive).

We believe that section 165(c) (2) requires a primary profit motive if a loss from a particular transaction is to be deductible.

Petitioner, however, points out that a multitude of transactions which are likely to be motivated primarily by tax reasons is nonetheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; purchases of property motivated by the availability of accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low income housing partnerships; and many others. Indeed, some of these transactions are arguably *solely* tax motivated.

We acknowledge that many such tax-motivated transactions are congressionally approved and encouraged. We therefore relax our holding that section 165(c) (2) permits loss deductions only from transactions entered into primarily for profit to allow for those essentially tax-motivated transactions which are unmistakably within the contemplation of congressional intent. The determination whether a transaction is one Congress intended to encourage will require a broad view of the relevant statutory framework and some investigation into legislative history. The issue of congressional intent is raised only upon a threshold determination that a particular transaction was entered into primarily for tax reasons.

We now proceed to apply this standard to the instant case. Petitioner's transactions, with one exception, had some potential for profit after commissions. We emphasize, however, that the ultimate issue is not profit potential but profit motive. Nevertheless, profit potential is a relevant factor bearing on profit motive.

We believe petitioner was aware of the possibility of making some profit on these transactions, and we are willing to assume, arguendo, that he was in part attracted by this prospect as well as by the prospect of very favorable tax benefits. Petitioner's employment as a commodities and currency dealer made him comfortable with the operation of offsetting positions and familiar with interest rate trends.

We must then determine which of petitioner's two motives was primary. By "primary," we mean "of first importance" or "principally." See *Malat v. Riddell*, 383 U.S. 569, 572 (1966); *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983). Profit motive refers to the desire for economic profit, independent of tax savings. *Malat V. Riddell, supra*; *Surloff v. Commissioner, supra*; *Knetsch v. United States*, 348 F.2d at 937–938.

Evaluating petitioner's motives is, of course, a factual inquiry. The language of section 165(c)(2) speaks of the taxpayer's motive in "entering" a particular transaction and thus our main focus must be on the time petitioner initiated his transactions. Nevertheless, all the circumstances surrounding petitioner's transactions, including the disposition of the options, are material to the question of petitioner's intent.[18] See *Golanty v. Commissioner, supra*; *Evans v. Rothensies*, 114 F.2d 958, 962 (3d Cir. 1940).

The burden of proof is on the petitioner to show that he entered into these transactions primarily for profit. Rule 142(a). Greater weight is accorded objective facts than is given to petitioner's self-serving statements characterizing his intent. *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

The characteristics of the marketplace maintained by Arbitrage Management are especially material to the question of petitioner's intent. Petitioner informed himself about the market and made a conscious decision to participate. It is a fundamental legal maxim that the consequences of one's acts are presumed to be intended. Accordingly, the nature of this Treasury bill options market reflects on petitioner's intent.[19]

---

[18]We do not, however, view this as inconsistent with the proposition that "if property is *acquired* in a transaction entered into for profit, a bona fide loss incurred on disposing of the property is deductible even if the taxpayer sells it at a particular time in order to establish a tax loss." B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 25.3, at 25-7 (1981).

[19]See B. Bittker, *supra*, par. 4.3.2, at 4–34.

We conclude without great difficulty that petitioner was motivated primarily by tax considerations, and not primarily by the desire for economic profit, when he participated in Arbitrage Management's over-the-counter Treasury bills options market. Petitioner learned of the market from a tax attorney at his place of business. Petitioner then had his accountant and tax adviser, Arthur Bell, speak with the principals at Arbitrage Management and evaluate the options program and its tax benefits.

The only written material that Bell received from Arbitrage Management was a letter explaining the tax treatment of the Treasury bill options transactions. Bell also learned about gravitational pull and the certainty of realizing losses on only the purchased options in the spreads, which losses would therefore be ordinary.

After talking with Bell, petitioner decided to undertake the trades. He sustained losses after commissions on each of his three sets of spread positions. While it is true that actual profits are not a prerequisite for the deductibility of losses, "a record of continued losses over a series of years or the unlikelihood of achieving a profitable operation may be an important factor bearing on the taxpayer's true intention." *Bessenyey v. Commissioner*, 45 T.C. 261, 273–274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Although petitioner theoretically could have made profits on his spread positions, he did not appear to make profit-maximizing decisions. At yearend, in 1978 and 1979, petitioner. executed switches into new spread positions which in each case offered a lower potential profit and higher potential loss than the preceding spread positions. After the 1979 switch transactions, it became theoretically impossible for petitioner to achieve a gain—his best result would have been a loss of $99.

Any impression that petitioner acted as a sophisticated investor responding to changes in interest rates in order to generate an economic profit is further dispelled by the identical behavior and experience of virtually all the participants in the Arbitrage Management market. The bulk of all trading occurred in November, December, and January. Customers commonly engaged in identical trading sequences, paying identical prices, and initiating, switching, and closing

out options positions on identical days. Very few customers realized profits after commissions.

The characteristics of the Arbitrage Management market in Treasury bill options were almost entirely defined by the tax law environment.[20] It is doubtful that trading could ever have been sustained at economical levels without the associated tax benefits. A NASD investigator conducting a routine review of Arbitrage Management's operations characterized the market as suitable "for customers who are in higher tax brackets and interested only in tax advantages." It was certainly more than coincidence that the demise of the market coincided with enactment of the anti-tax straddling provisions of the Economic Recovery Tax Act of 1981.

The market was designed to capitalize on the foreseeable rise of a specific Treasury bill's price as the bill's maturity date approached. This gravitational pull effect made losses inevitable on the purchased put options and assured customers of losses on that leg of their spreads which would permit ordinary loss deductions.

Arbitrage Management took advantage of gravitational pull by pricing the Treasury bill options deeply "in-the-money." This meant that strike prices for the options were set much higher than the prevailing market price of the particular Treasury bill.

The fact that Arbitrage Management priced its put options so deeply in-the-money meant that the bulk of the premium— usually more than 85 percent—was attributable to intrinsic value. Because the premium was composed primarily of intrinsic value, and intrinsic value unlike time value is entirely a function of the market price of a Treasury bill, the premium was subject to a foreseeable erosion due to the gravitational pull effect. In addition, options priced so deeply in-the-money offered a substantial premium available for.

---

[20]The result was a market which displayed peculiarities completely novel among options markets, generally. Particularly singular were the practices of trading only put options and only spread positions. The value of spreads as an investment strategy is viewed with skepticism by some commentators: "A further comment should be made about these bearish spreads. For them to be successful, a significant drop in price must occur over a short period of time. * * * If this is so, why not simply purchase a put? The commission costs are less, the losses on trades that don't work are nearly equivalent, and with the put, the profit potential is far greater." H. Clasing, The Dow Jones-Irwin Guide to Put and Call Options 218 (1978).

erosion, able to underpin substantial paper losses on only a few options positions at minimal commissions cost.

Accordingly, we do not hesitate to find that petitioner's motive in entering into these transactions was primarily to obtain tax advantages. It remains then to consider whether these transactions are a variety of tax-motivated transactions which Congress intended to encourage.

Tax planning is an economic reality in the business world and the effect of tax laws on transactions is routinely considered along with other economic factors. See *Commissioner v. Brown*, 380 U.S. 563, 579–580 (1965) (Harlan, J., concurring). Congress has often turned this fact into a tool by which to encourage particular conduct and achieve certain policy goals. Numerous provisions of the Internal Revenue Code attest to this. See, e.g., sec. 168(f)(8) (safe-harbor leasing); sec. 1039(b)(1) (nonrecognition of gain on sale of low income housing); sec. 103(b) (industrial development bonds).

These tax straddling options transactions can hardly be said to number among congressionally approved, sanctioned, or encouraged responses to the tax laws. We need not even look to the subsequently enacted anti-tax straddling legislation for support. We need only look to the policies and history of section 165(c)(2) to see that transactions such as these, in which paper losses enormously exceeded the amounts actually at risk, were utterly outside the contemplation of Congress.[21]

Section 165(c)(2)'s profit motive requirement made its debut in the Revenue Act of 1916. The provision permitted for the first time the deduction of losses not connected with a trade or business but only if they arose from "transactions entered into for profit." Revenue Act of 1916, sec. 5(a)(5th) (1916) (amended 1918). The expanded deductibility of losses was a recognition that actual losses from speculative investments did leave a taxpayer poorer. The purpose of the provision was to more accurately tax true economic position. One Congressman explained:

---

[21]Cf. sec. 465. In proposing sec. 465, the Senate Finance Committee explained:

"When an investor is solicited for a tax shelter activity, it has become common practice to promise the prospective investor substantial tax losses which can be used to decrease the tax on his income from other sources. The committee believes that it is not equitable to allow these individual investors to defer tax on income from other sources through losses generated by tax sheltering activities, to the extent the losses exceed the amount of actual investment the taxpayer has placed at risk in the transaction. [S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 85.]"

Now, this bill permits all taxpayers to deduct their losses that are made in their business or outside of their business during the year. If I make $10,000 in the practice of the law and lose $10,000 on the stock market I can deduct it, because in the case I have supposed I would have no income left. [56 Cong. Rec. 678 app. (1918) (Statement of Mr. Kitchin).]

In contrast, petitioner's claimed losses over 4 years in this case hardly left him $137,503 poorer.

A significant amendment to the provision which was to become section 165(c)(2) occurred in the Revenue Act of 1924. The 1924 amendment demonstrated explicitly that Congress was concerned with excluding paper losses of precisely the sort claimed by petitioner. Language was added which disallowed losses sustained in connection with essentially offsetting transactions:

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business; * * * No deduction shall be allowed under this paragraph for any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities where it appears that within thirty days before or after the date of such sale or other disposition the taxpayer has acquired (otherwise than by bequest or inheritance) *or has entered into a contract or option to acquire* substantially identical property, and the property so acquired is held by the taxpayer for any period after such sale or other disposition. [Revenue Act of 1924, sec. 214(a)(5) (1923) (amended 1928).]

Senator Reed expressed the purpose of the amendment as follows:

The law has been very liberal in allowing the deduction of losses incurred outside of one's trade or business. We want to put an end to the abuse of that, if it can be done. At the end of every year we see the stock market thrown into a state of mild convulsions because men are taking out from their safe-deposit boxes and selling all the securities on which they can show a loss, and they immediately put back the money into something just the same, or substantially the same. They incur no real loss, but they have a paper loss with which they wipe out their taxable income. [65 Cong. Rec. 7604 (1924) (Statement of Senator Reed).]

The language of this amendment was the forerunner of the wash sales rule now codified as section 1091. See Revenue Act of 1928, sec. 118 (1928). Indeed, Congress turned to this provision in the Economic Recovery Tax Act of 1981 in order

to combat straddle abuses. It directed that the wash sales rules be extended to straddles by regulation. See sec. 1092(b).

The transactions at issue here take unintended advantage of the practical necessity of preserving the integrity of separate taxable years. Congress never intended such stratagems to prosper. In disallowing these loss deductions, we do not violate the integrity of the taxable year but merely take a broader view of the substance of these transactions in order to effectuate the clear import of section 165(c)(2). The inquiries into profit motive and congressional intent are not limited by the parameters of a single taxable year.

Congress permitted the deduction of nonbusiness losses in order to more accurately tax true economic position. The limitation of such deductions to profit-seeking transactions was a necessary protection against abuses such as the tax-motivated transactions before us here. We implement that protection here by holding that petitioner's loss deductions are disallowed.

To reflect certain concessions and adjustments,

*Decision will be entered under Rule 155.*