T.C. Memo. 1998-351


UNITED STATES TAX COURT


DON AND MARGARET TAYLOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21611-97.                    Filed October 5, 1998.



<u>Noel Bisges</u>, for petitioners.

<u>Douglas Polsky</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.[1]

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years in
(continued...)

Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1992 and 1994 in the amounts of $1,234 and $5,262, respectively, as well as accuracy-related penalties under section 6662(a) in the amounts of $68 and $175, respectively.

After concessions by petitioners,[2] the only issue for decision is whether petitioners are entitled to capital loss carryovers for the years in issue based on the sale of a residential property. We hold that they are not.

FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. Petitioners resided in Gravois Mills, Missouri, at the time that their petition was filed with the Court.

Petitioners are husband and wife. Prior to February 1991, petitioners resided and owned real property in Thousand Palms, California (the Thousand Palms Property). The Thousand Palms Property included a single-family home, a work area (a 20-foot by 40-foot garage) used by petitioner Mr. Taylor in his construction business, and a mobile home. These structures were located on a

_____

[1](...continued)
issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioners have conceded the Schedule C adjustments for the years in issue and the penalties under sec. 6662(a) relating to these adjustments.

5 acre parcel of land. For tax purposes, petitioners treated 25 percent of this property as used for business.

Petitioners planned to move to Missouri for semiretirement. In this regard, petitioners entered into a contract to purchase a campground in Missouri (the Missouri Property) in October 1990. Petitioners paid an $11,000 earnest money deposit toward this contract. Petitioners intended to use a portion of the Missouri Property as a residence and to rent the other portions to supplement their retirement income.

Thereafter, in November 1990, petitioners listed the Thousand Palms Property for sale at a listing price of $650,000. Given its uniqueness, petitioners hoped that an individual in the construction business would be interested in their property. Sometime in January 1991, petitioners were contacted by a married couple, Mr. and Mrs. Norris (the Norrises). The Norrises proposed a transaction to exchange properties with petitioners. The Norrises owned a single-family home on a 1-acre lot in Palm Springs, California (the Palm Springs House). The Palm Springs House was listed at $529,000 and had been on the market for more than 4 months.

Even though Palm Springs and Thousand Palms are neighboring communities, their residential real estate markets are not similar. Palm Springs homes are typically larger and much more

expensive than the homes in Thousand Palms. Petitioners had not previously owned any property in Palm Springs.

Petitioner Mr. Taylor investigated the Palm Springs residential sales market to determine the value of the Palm Springs House. Subsequently, petitioners and the Norrises agreed that they would treat the exchange of the two properties as two separate sales, with a reduced selling price for each property of $460,000. The California residential real estate market declined sometime in the early 1990's. It is not clear whether petitioners were aware of this decline at the time of this transaction.

Petitioners closed the sale of their Thousand Palms Property in February 1991. In consideration, petitioners received cash in the amount of $150,000, unsecured notes in the amount of $288,000, mortgage relief in the amount of $6,740, and a $15,260 payment to petitioners' real estate broker. Petitioners paid for their purchase of the Palm Springs House by obtaining a $300,000 mortgage and using the funds obtained therefrom to pay off the Norrises' existing mortgage. Petitioners did not pay out-of-pocket cash or incur any other debt to pay for this purchase. Petitioners satisfied the remaining $160,000 due by transferring equity from the Thousand Palms Property to the Norrises.

Within a few weeks after the sale/exchange of the Thousand Palms Property, petitioners closed their purchase of the Missouri

Property at a price of $132,500. Petitioners used the cash obtained from the Thousand Palms Property sale/exchange for the Missouri Property purchase. Upon obtaining the Missouri Property, petitioners promptly moved to Missouri.

At about the same time; i.e., immediately after obtaining the Palm Springs House, petitioners listed the house for sale with a real estate agent. The list price for the Palm Springs House was $525,000, but the listing stated that as petitioners were absentee owners they would accept most offers. In the interim, petitioners did not offer the Palm Springs House for rent. The Palm Springs House had never been lived in, and renting it might have caused a reduction in the value of the house. In the meanwhile, petitioners incurred mortgage interest expense on the Palm Springs House mortgage. Petitioners paid the mortgage interest expense through an escrow account set up by petitioners at the time of their purchase. Petitioners established the escrow account for their convenience because they intended to sell the Palm Springs House immediately.

Petitioner Mr. Taylor was a real estate agent. However, he used his real estate agent's license in the contracting business and not in the sales business. He was not the listing agent for the sale of the Thousand Palms Property or subsequently for the Palm Springs House. However, petitioners had in the past: (1) Purchased low cost residential properties in Thousand Palms,

rented the same, and subsequently sold such properties at a profit; and (2) purchased raw land, cleaned and leveled off the land, and resold the land at a profit.

Petitioners sold the Palm Springs House in July 1991, only 5 months after purchasing it, for $377,500. Petitioners claimed a capital loss of $133,592 with respect to this sale. On their 1991 Federal income tax return, petitioners offset the gain on their sale of the Thousand Palms Property, and certain other gains, against the capital loss claimed from the sale of the Palm Springs House. Having offset these gains, petitioners reported a short-term capital loss carryover on their 1991 return in the amount of $49,292. Petitioners then utilized portions of the loss carryover in the years in issue to offset certain capital gains in those years.

Respondent determined that petitioners did not incur a capital loss on the sale of the Palm Springs House and therefore disallowed the carryover to the years in issue.[3]

OPINION

Profit Motive

Respondent's determination in the notice of deficiency essentially embodies the notion that the loss from the sale of a

---

[3] For reasons not discussed in the record, respondent did not determine any deficiency for 1991; i.e., for the year of the alleged loss.

personal residence is nondeductible, a principle which is indisputable. See sec. 1.165-9(a), Income Tax Regs. Respondent contends that the sale/exchange of the Thousand Palms Property for the Palm Springs House and the immediate sale thereafter of the Palm Springs House was in essence a means to enable petitioners to complete the sale of their Thousand Palms Property. Consequently, respondent maintains that petitioners did not purchase the Palm Springs House with the requisite profit intent to claim a loss under section 165(c)(2).

Petitioners contend that they did not purchase the Palm Springs House as a personal residence, rather that they purchased it as an investment. Therefore, they maintain that the loss on the sale of the Palm Springs House constitutes a loss incurred in a transaction entered into for profit under section 165(c)(2) and entitles them to a capital loss carryover for the years in issue. We disagree with petitioners for the following reasons.

Section 165(c)(2) provides that an individual is entitled to claim a loss incurred in a transaction entered into for profit even if the transaction is not connected with a trade or business.

Section 183 and the regulations promulgated thereunder provide guidance as to whether a transaction is entered into for profit. The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit

objective exists. Some of these factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value. Sec. 1.183-2(b), Income Tax Regs.

No single factor, nor even the existence of a majority of factors, favoring or disfavoring the existence of a profit objective is controlling. Id. Rather, the relevant facts and circumstances of the case are determinative. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Furthermore, the existence of the requisite profit objective is a question of fact that must be determined on the basis of the entire record. Benz v. Commissioner, 63 T.C. 375, 382 (1974). In resolving this factual question, greater weight is accorded to objective facts than a taxpayer's mere statement of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Engdahl v. Commissioner, 72 T.C. 659, 667 (1979); Churchman v. Commissioner, 68 T.C. 696, 701 (1977); see sec. 1.183-2(a), Income Tax Regs.

To be entitled to a loss under section 165(c)(2), petitioners' "primary" motive for entering into the transaction must have been to make a profit. Fox v. Commissioner, 82 T.C. 1001, 1021 (1984). The term "primary" is defined as "of first

importance" or "principally".  See Malat v. Riddell, 383 U.S. 569, 572 (1966); Fox v. Commissioner, supra; Surloff v. Commissioner, 81 T.C. 210, 233 (1983).  Although profit need not be the sole motive, if the taxpayer's intent to make a profit is merely incidental, the taxpayer will not be entitled to the loss under section 165(c)(2).  Cotner v. Commissioner, T.C. Memo. 1996-428.

Consequently, if the taxpayer's overriding purpose for purchasing the real estate is personal, the requisite profit motive cannot be established.  See O'Neill v. Commissioner,  T.C. Memo. 1985-92; Nicath Realty Co. v. Commissioner, T.C. Memo. 1966-246.  Also, if the taxpayer purchases property with the expectation of making a profit on the sale after it has served the personal purposes for which it was initially purchased, then profit motive is not the primary motive.  Meyer v. Commissioner, 34 T.C. 528 (1960).

We now analyze whether petitioners possessed the requisite profit motive to claim a loss under section 165(c)(2).  We first consider the relevant factors outlined under section 1.183-2(b), Income Tax Regs.

Our first inquiry is whether petitioners purchased the Palm Springs House in a businesslike manner.  We find that petitioners' behavior in purchasing the Palm Springs House was not businesslike.  Petitioners were not aware of the Palm Springs

House until the same was brought to their attention by the Norrises. The Norrises proposed that they would purchase petitioners' Thousand Palms Property only if petitioners would purchase the Palm Springs House.

We are guided in this regard by O'Neill v. Commissioner, supra, where, in an analogous situation, the property had been brought to the taxpayer's attention by her daughter. There, the taxpayer's daughter had been unable to obtain financing and requested that the taxpayer purchase the property for the daughter's rental use. We held that the taxpayer had not purchased the residential real property in a businesslike manner and hence that the taxpayer did not possess the requisite profit motive. Similarly, we do not think that petitioners purchased the Palm Springs House in a businesslike manner.

We next find that the time and effort petitioners spent in carrying on the activity is not indicative of a profit motive. Petitioners point out that they took the time to investigate the value of the Palm Springs House by looking at comparables. However, any prudent purchaser of residential property would investigate the value of comparable property. Accordingly, such action, in and of itself, is not indicative of a profit motive.

Petitioners have not indicated that they spent any other time or effort to ensure the profitability of their alleged investment. In fact, petitioners immediately listed the Palm

Springs House for resale and moved to Missouri for semiretirement. Once in Missouri, there is no indication that petitioners engaged in any activity designed to enhance the profitability of their alleged "investment". Regarding the rental business of residential property, we have previously held that "Generally, residential property is not purchased for investment purposes where the property is located in a distant city if there are additional costs involved in its management." O'Neill v. Commissioner, supra. We think that given the circumstances, the same principle applies here. We find that the amount of time petitioners spent on the purchase and resale of the Palm Springs House indicates that petitioners did not possess the requisite profit motive.

As to petitioners' expertise, we find that although petitioner Mr. Taylor was a real estate agent, he did not use his expertise in this endeavor. First, petitioner Mr. Taylor used his real estate agent's license in the contracting business and not in the sales business. Next, any familiarity that petitioner Mr. Taylor may have had with the residential real estate market was limited to low-price housing and raw land in the Thousand Palms locality. The Palm Springs residential real estate market was different from the Thousand Palms residential real estate market.

Furthermore, petitioner Mr. Taylor was not the listing agent on the sale of the Palm Springs House.  Rather, petitioners moved to Missouri immediately after the purchase of the house and listed their house with another real estate agent.  Thus, even if petitioner Mr. Taylor possessed any expertise in the residential real estate activities, he did not utilize the same in the resale of the Palm Springs House.

We also believe that petitioners did not obtain the Palm Springs House with the expectation that it might appreciate in value.  Petitioners contend that they expected to make a quick profit from the sale of the Palm Springs House.  Petitioners purchased the Palm Springs House at a reduced price of $460,000 after the house had been on the market for 4 months.  This price was $69,000 less than the price at which it was listed. Petitioners maintain that they were not aware of any decline in the real estate market at the time of their purchase of the Palm Springs House, yet they were not alarmed that the Norrises had been unable to sell the house during the 4-month listing period or that they were willing to accept such a reduced price.

Petitioners claim that they hoped to make a "quick" $60,000; i.e, a 13 percent, profit.  We think that petitioners could not realistically have had such expectations.  There is no reason to surmise that petitioners were unaware of the costs, sometimes exceeding 10 percent of the sales price, associated with the sale

of real estate through a third-party real estate agent.  In addition, petitioners surely realized that they would incur mortgage interest expense prior to the resale of the Palm Springs House.  Any possible profit would have been eroded, if not eliminated, by such expense.  Under these circumstances, we find that petitioners did not obtain the Palm Springs House with the expectation that they could benefit from a possible appreciation in its value.

Our examination of the relevant profit motive factors delineated under section 1.183-2(b), Income Tax Regs., leads us to conclude that although petitioners "hoped" for some profit, they did not have the requisite profit motive to claim a loss under section 165(c)(2).

Rather, we agree with respondent that petitioners' primary motive in purchasing the Palm Springs House was to get one step closer to moving to Missouri.  We are persuaded by respondent's argument that petitioners were eager to move to Missouri for semiretirement, that they anticipated some difficulty in selling the Thousand Palms Property, and that the sale/exchange with the Norrises for a single-family home enabled them to: (1) Move to Missouri, and be left with the less onerous task of selling a single-family home in a more populated area; and (2) obtain the additional cash required for their purchase of the Missouri Property.

Many factors support respondent's theory.  The Thousand Palms Property was a highly specialized property.  The property included a single-family home, a construction work area, and a mobile home.  Petitioners realized that only a limited group of individuals would be interested in such a property.  As previously noted, it was the Norrises who contacted petitioners. The Norrises were willing to purchase the Thousand Palms Property if petitioners would purchase their home; i.e., the Palm Springs House.  As a new single-family house, the Palm Spring House was probably easier to sell.  Furthermore, the sale/exchange transaction was designed in such a manner to provide petitioners with the additional cash required to purchase the Missouri Property.  In fact, petitioners used the cash thus obtained to close their purchase of the Missouri Property.  Also, petitioners immediately listed the Palm Springs House for resale in order to complete the transaction and their move to Missouri.  Thus, we view petitioners' sale/exchange of one property for another and the immediate resale of the latter, as primarily motivated by personal reasons.

Hence, despite the fact that petitioners did not purchase the Palm Springs House for use as their personal residence, we think that petitioners' motive was more personal in nature.  See O'Neill v. Commissioner, T.C. Memo. 1985-92; Nicath Realty Co., Inc. v. Commissioner, T.C. Memo. 1966-246.  Here, although we

find that the desire to make a profit was not completely lacking, it was only incidental in nature.  Cotner v. Commissioner, T.C. Memo. 1996-428.

Petitioners cannot avoid the effect of the statute and the regulations disallowing petitioners to claim a loss relating to the sale of a residence by dividing the transaction into a series of transactions.  Under these circumstances we shall consider the transaction as a whole and shall not allow petitioners to claim a loss under section 165(c)(2).  Cf. United States v. Kyle, 242 F.2d 825 (4th Cir. 1957); Quinn v. Commissioner, T.C. Memo. 1983-485; Butrick v. Commissioner, T.C. Memo. 1972-59.

Consequently, we hold that petitioners' primary motive in purchasing the Palm Springs House was not profit and that petitioners are therefore not entitled to capital loss carryovers for the years in issue.

To reflect our disposition of the disputed issue, as well as petitioners' concessions,

Decision will be entered

for respondent.