JACK C. AND PHYLLIS TWAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tway v. Commissioner
Docket No. 4767-87
United States Tax Court
T.C. Memo 1993-212; 1993 Tax Ct. Memo LEXIS 212; 65 T.C.M. (CCH) 2655; May 17, 1993, Filed; As Corrected May 18, 1993 *212 For petitioners: Eugene Chester and James H. Kenworthy. For respondent: Osmun R. Latrobe. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Tax Year Ended
Deficiency
December 31, 1979
$ 393,009.06
December 31, 1980
25,043.13
The principal issue for decision is whether the pre-1981 losses realized by petitioners from certain transactions involving silver futures straddles are deductible under section 165. Unless otherwise stated, all section references are to the Internal Revenue Code, as in effect for the years in issue. This issue turns on whether the straddle transactions at issue are "transactions entered into for profit though not connected with a trade or business" within the meaning of section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2817 (herein referred to as DEFRA section 108). FINDINGS OF FACT The Stipulation of Facts and Supplemental Stipulation of Facts filed by the parties and the exhibits attached thereto are incorporated herein *213 by this reference. Petitioners resided in Oklahoma City, Oklahoma, when they filed the petition which commenced this case. Throughout this opinion we refer to Mr. Jack C. Tway as petitioner. Petitioner is a college graduate with a degree in history. During the years in issue, he was president of R. Tway, Inc., a large highway contractor doing business in Oklahoma and in neighboring States. He was also a partner in Tway Construction Co., a partnership which was doing business as a highway contractor, and he served on the board of directors of Liberty National Bank of Oklahoma City. Petitioner is a knowledgeable and sophisticated businessman who engages in the purchase and sale of commodity futures contracts. A commodity futures contract is an agreement to deliver or receive a specified quantity and grade of a commodity during a designated future month. A person who buys a commodity futures contract undertakes to receive, and pay for, the underlying commodity in the month specified. This is sometimes referred to as a "long" position. A person who sells a futures contract undertakes to deliver the commodity in the designated month. This is sometimes referred to as a "short" *214 position. A single position calling for the purchase or sale of a designated commodity is described as an "open contract". Every futures position is matched by an exactly opposite position (or series of positions) held by one or more other persons. Thus, a price movement creating a gain or loss as to an open position (long or short) will produce an equal but opposite gain or loss to the other side of that position (short or long). The holder of a futures contract may, and usually does, avoid the obligation to deliver or receive the commodity in the future month specified in the contract by purchasing or selling an offsetting futures contract. Thus, for example, a person whose futures contract obliges him to deliver a certain quantity of silver in the next April need not make that delivery if, before delivery is due, he acquires a contract to receive the same amount of silver in April. When a trader enters into an offsetting futures contract, he usually realizes a gain or loss, in the amount of the difference between the price of the commodity underlying each of the offsetting contracts. In general, a long position will increase in value during a time of rising prices. When *215 prices are rising, the trader's right to purchase the commodity at the lower price becomes more valuable. Rising prices have the opposite effect upon a short position. The holder's obligation to deliver the commodity at the earlier lower price diminishes in value as the price of that commodity rises. The reverse is true for falling prices. In that situation, a trader's obligation to purchase the commodity at the earlier higher price, a long position, loses value as the price of the commodity drops. Falling prices help a short position, however. The contract right to sell the commodity at the prior higher price gains in value as the price of the underlying commodity drops. For many years prior to 1979, petitioner had actively traded commodity futures for his own account. Respondent's post-trial brief refers to petitioner as the "rarest of all commodities, a successful commodity futures trader". Prior to 1979, petitioner traded agricultural commodities such as pork bellies, live hogs, soybeans, wheat, and cocoa. He generally entered into a futures contract and allowed it to remain open for only a short period of time before closing the contract to realize a profit or minimize *216 a loss. During the years at issue, petitioner traded through Bache Halsey Stuart Shields, now known as Prudential Bache (hereinafter Bache) and Conti-Commodity, Inc. Petitioner always used nondiscretionary accounts with his brokers -- that is, petitioner made his own investment decisions. By the end of August 1979, petitioner had realized net profits of $ 718,927.35 from trading through his accounts with Bache and Conti-Commodity. During the summer of 1979, prices on the silver commodities market began to rise dramatically. For example, at the beginning of that year, the price of one ounce of silver for delivery in the following January (January silver) was $ 6.49. By August of 1979, the price of January silver had risen to $ 10.92 per ounce, and by the end of 1979, January silver was trading at $ 34.15 per ounce. An article in the Wall Street Journal of July 18, 1979, described the silver market as follows: While even the government concedes that a recession is at hand, escalating silver prices have done anything but reverse their climb. Within the past month, prices have risen 10.2% * * *; that price represents a 56% rise in silver's value since the beginning of the *217 year. Silver specialists are agog at the market's performance.
The same article noted that silver specialists disagreed about the way the market would move. The article quoted one "veteran silver analyst" as contending that "silver currently is overpriced. The important move from here is on the downside, not the upside". Another specialist doubted that the price of silver would decline until the Government took drastic measures to revitalize the dollar. Other analysts stated: "Given the current uncertain economic outlook, almost anyone's price predictions for silver could appear reasonable * * * it's likely the market will be 'highly volatile' in the months ahead". On August 15, 1979, the Wall Street Journal reported: "silver's price rose as high as daily trading limits allow". On August 16 and 17, 1979, petitioner bought (long) 20 standard lots of December silver. He held these contracts until August 22, 1979, when he closed them out by selling 20 short contracts of December silver. He netted approximately $ 31,000 from that transaction. On August 28, 1979, petitioner bought (long) 10 contracts of December silver and closed them out with offsetting short contracts *218 on the following day. The intervening rise in silver prices netted him a gain of slightly more than $ 15,000. Two days later, on August 31, 1979, petitioner entered into another open long position in silver, purchasing 20 standard lots of December 1979 silver. Petitioner closed that position out on the same day, taking profits of almost $ 23,000. The price of each of the contracts bought or sold by petitioner was determined by the market price at the time petitioner entered into the transaction. With respect to each of the contracts, another person actually held or acquired an interest opposite to petitioner's interest. During the times here involved, each of petitioner's silver futures contracts called for the delivery of a "standard lot", 5,000 Troy ounces, of silver. The silver trading described above was the type of trading petitioner was accustomed to in the agricultural commodities markets. They were trades of positions which petitioner opened and closed rapidly to take profits or to cut losses, depending upon how the market moved. Mr. Robert Cochran was petitioner's broker at Bache. Petitioner considered him "a very good broker". By August of 1979, Mr. Cochran had *219 been advising petitioner "for several months" of developments in the silver futures market. Mr. Cochran, noting that the silver market was "going so crazy", urged petitioner to change his investment approach. Mr. Cochran advised petitioner to invest in silver straddles in order to gain some profits while minimizing his risks. A straddle is a specific form of investing in futures contracts. It is a combination of long and short positions. Each position is a "leg" of the straddle. The long leg consists of a contract or contracts for the purchase of a commodity in a specified future month. The short leg represents a contract or contracts for the sale of the same amount of the commodity in a different month. The nature of the contract in the more distant month determines the nature of the straddle. Thus, a short March/long May straddle is a long straddle. The "spread" represents the difference between the price of each leg of the straddle. A change in the spot price of the commodity will usually cause opposite (but not necessarily equal) movements in the value of the opposing positions. If the spread widens or narrows, the holder will incur either a net gain or loss, assuming *220 the two legs (positions) are closed simultaneously. If the party holds an open position, as opposed to a straddle, then the party is in a risk position because market forces inevitably cause the price of the underlying commodity to rise or fall. A straddle reduces that risk because, as the value of one leg decreases, the value of the other leg generally increases. When the holder of a straddle closes one leg of the straddle, the other leg becomes an open contract. As noted above, that is a relatively risky position. The holder generally minimizes that risk by simultaneously entering into a position that is identical to the leg that he had closed out, except for a modified delivery date. This procedure is called a "switch". Despite an earlier unprofitable experience with a gold straddle, petitioner accepted Mr. Cochran's advice. On August 28, 1979, petitioner established a silver futures straddle. All of petitioner's silver straddle positions for the period at issue are set forth in appendix A. He established all the positions summarized on appendix A on the New York Commodity Exchange, Inc. (Comex). The net value of petitioner's straddle holdings for each day petitioner *221 held them are set out in appendix B. Initially, petitioner believed that the price of silver, which had increased earlier in the summer of 1979, would drop before it made further significant gains. To take advantage of these anticipated price movements, on August 28, 1979, petitioner sold (short) 40 contracts or standard lots of January 1980 silver. At the same time, he bought (long) 40 standard lots of March 1980 silver. His resulting straddle was as follows: Sell: 40 lots January silver - Price: $ 10.35 per ounce Buy: 40 lots March silver - Price: $ 10.513 per ounce Silver prices did not drop. They continued their upward climb immediately following petitioner's initial investment in the straddle. Petitioner and Mr. Cochran believed that the continuing rise in silver prices was due in part to large purchases of long silver positions by several unrelated parties, including the Hunt brothers, Messrs. Nelson Bunker Hunt and W. Herbert Hunt. See generally Hunt v. Commissioner, T.C. Memo. 1989-335. Petitioner and Mr. Cochran were concerned that the rising prices reflected an attempt by one or more of these parties to cause a "squeeze" in the silver *222 futures market in the early part of 1980. A squeeze arises when there is more demand for actual delivery of the commodity than the current supply. The holders of enough long positions can cause a squeeze by threatening to take physical delivery. The squeeze puts pressure on holders of short positions, who are faced with the need to deliver the underlying commodity which they may not possess. As a result, during a squeeze, the price of the commodity rises dramatically. In the last half of 1979, the financial press reported the possibility of a squeeze in the silver markets. The Wall Street Journal, on August 30, 1979, stated: silver prices continued to climb on the New York Commodity Exchange, mainly because of the large number of long positions, or commitments to receive, taken by * * * a major brokerage firm, traders contended. * * * As prices rose, "more and more of the speculating public was attracted to the market increasing the upward momentum * * *".
A week later, the Wall Street Journal of September 6, 1979, reported the continued surge in gold and silver prices. It noted: "As often happens when prices move without apparent reason, rumors of manipulation *223 have filtered among traders". On September 21, 1979, the Wall Street Journal quoted an "industry source" as saying that the Comex "board was very afraid that there's a squeeze on the markets". An extensive news article by Ms. Julie Salamon entitled "The Silver Bulls: Heavy Buying of the Metal by Speculators Raises Fears of a Possible Future Squeeze", which appeared in the Wall Street Journal on October 26, 1979, stated as follows: Yet, despite all the hurdles that have been set up to discourage speculative excesses, the bull market in silver rages on, arousing fears that in a few months there won't be enough silver to satisfy the delivery contracts of those who are "long" on the metal. The possibility of a delivery squeeze, or a "corner," always brings near-panic to a commodities exchange, and the current silver boom is no exception.
In a retrospective article, also written by Ms. Salamon, published in the Wall Street Journal for November 30, 1979, the author stated as follows: The threat of a squeeze has been hanging over the market since early August, when a few speculators began amassing many silver future contracts, apparently intending to take delivery. * * * *224 Those big players, whose buying caused prices to nearly double during the last six weeks of summer, are widely believed to include Nelson Bunker Hunt and his brother W. Herbert Hunt, the sons of the late Texas billionaire H.L. Hunt * * *.
During the time when a squeeze or potential squeeze is in process, a commodities trader can use a short straddle position to realize a profit. To do so, he must predict the squeeze month accurately, establish a long (buying) position in or shortly before the squeeze month, and establish a short (selling) position in a month for delivery after the squeeze. On September 4, 1979, based upon his anticipation of a squeeze on the market in early 1980, petitioner closed out his January 1980 short position by purchasing 40 contracts for January 1980 silver. This transaction is summarized as follows: Sell: 40 lots January silver - Price: $ 10.35 per ounce Buy: 40 lots January silver - Price: $ 11.32 per ounce Petitioner incurred a loss of $ 194,000, plus an additional $ 690 in commissions, from the above transaction. See appendix A, position 02. The loss was computed on the sale of 200,000 ounces of silver (40 lots x 5,000 oz. per lot) times *225 97 cents (the difference between the price per ounce of silver in the offsetting contracts). At the same time, petitioner had an unrealized, and, hence, untaxed gain of approximately the same amount in his March gain leg. Taking into account both the long leg and the short leg, petitioner had a potential profit on September 4, 1979, of $ 4,600. See appendix B. Petitioner replaced his January 1980 short position with a May 1980 short position. This switch changed petitioner's initial long January/March straddle to a short March/May straddle. Petitioner kept the long March leg, speculating that the squeeze would most likely occur in March. After making the above switch, petitioner was left with the following straddle: Buy: 40 lots March silver - Price: $ 10.513 per ounce Sell: 40 lots May silver - Price: $ 11.552 per ounce The silver markets continued to be highly volatile. An article which appeared in the Wall Street Journal on September 19, 1979, begins: Chaos has struck the silver market. The metal's price has soared an unprecedented 75% since Aug. 20. Yesterday alone, prices gained 10.3% to close at $ 15.90 an ounce for September delivery on the Commodity Exchange *226 in New York, up $ 1.65, a record daily increase. * * * "The market is out of control," says a trader at a leading precious metals concern. "People are really going to get hurt." "If any member has a substantial short position" or commitment to deliver, "they're in trouble," says James Boe, a Comex official.
Mr. Cochran reported to petitioner rumors that a high-volume trader, Mr. Henry Jarecki, held many short contracts for May delivery and might be caught in a squeeze. He advised petitioner to change some of his May contracts to avoid being caught in the same situation. On September 21, 1979, petitioner switched 30 of his short contracts from May 1980 to July 1980. Petitioner closed out the short May contracts as follows: Sell: 30 lots May silver - Price: $ 11.552 per ounce Buy: 30 lots May silver - Price: $ 16.356 per ounce He incurred a loss of $ 720,600 and commissions of $ 517.50, as a result of the above. See appendix A, position 03. After petitioner's switch of 30 short contracts from May 1980 to July 1980, his new straddle was as follows: Buy: 40 lots March silver - Price: $ 10.513 per ounce Sell: 10 lots May silver - Price: $ 11.552 per ounce Sell: 30 lots *227 July silver - Price: $ 16.450 per ounce Again, he had preserved an unrealized gain in the long March leg of his new short March/May/July 1980 straddle. Petitioner's economic position at that time, taking into account all legs of his straddle, was a net unrealized gain of approximately $ 18,600. See appendix B. In an article published on October 10, 1979, the Wall Street Journal quoted Mr. Jarecki as denying rumors of straining to meet margin calls on his short positions. He was quoted as saying: "'Here I am, weeks of gossip later, healthy, fat and making money.'" Petitioner learned that, in fact, Mr. Jarecki had reached a settlement with the high-volume holders of the long May contracts. Accordingly, on October 18, 1979, petitioner reversed the September 21, 1979, transaction which had created the short March/May/July straddle. He went back to the short March/May straddle which he preferred. The narrower spread between months of the straddle reduced the risk of loss inherent for the 30 contracts involved in the wider March/July spread. Petitioner realized a loss of $ 219,000 and commissions of $ 562.50, from this transaction. See appendix A, position 04. At this time, *228 petitioner's economic position, considering both legs of the straddle, was a net unrealized loss of $ 58,400. See appendix B. During the period from October 18 to December 17, the price of silver generally increased. By December 17, the increase was greater in May silver than in March silver, thereby increasing petitioner's unrealized losses in his short straddle. Petitioner's actual position on December 17, 1979, was a net economic loss in the amount of $ 77,400 on all of his silver straddle transactions, realized and unrealized. See appendix B. In December 1979, petitioner became concerned that the margin cost on silver futures contracts, such as those which petitioner held, was about to increase substantially. Margin costs are those amounts which a trader must deposit with his broker to insure against loss on commodities trades. Because of his large losses, both realized and unrealized, and because of the threat of larger margin requirements, petitioner began reducing his positions. He intended to limit future losses, and margin payments, but still maintain the possibility of future gain. Thus, on December 17, 1979, petitioner reduced his straddle by buying 10 lots of *229 May silver and selling 10 lots of March silver. This reduced his straddle position to 30 contracts in each leg. He realized a loss of $ 602,587.50 by closing out the May silver and a gain of $ 634,787.50 by closing out the March silver, or a net gain of $ 32,200. See appendix A, position 05. On the following day, he reduced his straddle by 12 more contracts, buying 12 lots of May silver and selling 12 lots of March silver. His net gain from these two transactions, after commissions, was $ 404,052. See appendix A, position 06. Ten days later, on December 28, 1979, petitioner reduced his straddle position in the same fashion by buying and selling four more lots. He realized a net gain, after commissions, of $ 133,584. Appendix A, position 07. In summary, as set forth in appendix A, petitioner realized total losses of $ 562,765 from his silver straddle transactions during 1979, and he paid commissions of $ 2,769 on those transactions. Thus, petitioner realized aggregate losses of $ 565,534 for the calendar year 1979 from trading in silver straddles. Petitioner's straddle transactions and other trading activities, both in silver futures and agricultural futures, were handled *230 through his account at Bache. For 1979, the records of petitioner's account at Bache show that he realized aggregate profits of $ 831,695 and aggregate losses of $ 1,282,740, including the above losses from his silver straddle transactions, from the trading in his account. He reported the difference between those amounts, $ 451,045, as a net short-term loss on the Schedule D, Capital Gains and Losses, which was attached to his joint 1979 Federal income tax return. At the beginning of 1980, petitioner had a straddle consisting of 14 long March/short May silver contracts, and he was still hoping to make a profit from the long-anticipated squeeze. Mr. Cochran informed petitioner that silver could be physically delivered to him as early as February on his long March 1980 contracts. Because of the costs involved in taking delivery of silver under these futures, petitioner decided to reduce his position still further. He did this through transactions on January 24, 1980, February 20, 1980, and February 25, 1980. See appendix A-2, positions 08, 09, and 10, respectively. After these transactions, petitioner had reduced his March/May straddle to three long and three short futures contracts. *231 After evaluating the costs of the loan needed to finance the purchase of 15,000 ounces of silver, plus the costs of storage and insurance, petitioner subsequently decided against taking delivery of any silver. Accordingly, on February 29, 1980, petitioner closed out the remaining silver contracts at issue. He realized a gain of $ 366,705 and paid commissions of $ 72.36, a net gain of $ 366,632.64, when he sold the three lots of March 1980 silver. He also realized a loss of $ 272,475, and paid commissions of $ 76.89, an aggregate loss of $ 272,551.89, when he bought three lots of May 1980 silver. In summary, as set forth in appendix A-2, petitioner realized an overall gain of $ 457,190 from his trading in silver straddles during 1980, and he paid commissions of $ 696.50 on those transactions. Thus, he realized a net gain of $ 456,493.50 from those transactions in 1980. With one exception, all of the transactions involved contracts which petitioner had held for less than 6 months. The exception was petitioner's sale on February 29, 1980, of three contracts for March 1980 silver to close out three contracts for March 1980 silver which he had originally acquired on August 28, *232 1979. As mentioned above, petitioner realized net gain of $ 366,632.64 on that transaction. The difference between the net gain which petitioner realized during 1980 from his trading of silver futures, $ 456,493.50, and the gain attributable to the contract held for more than 6 months, $ 366,632.64, is the gain attributable to contracts held for less than 6 months, $ 89,860.86. As was true in 1979, all of petitioner's trading in silver straddles was handled through his account at Bache, along with his trading in other commodities. For 1980, the records of petitioner's account at Bache show that he realized aggregate short-term profits of $ 470,196.75, including $ 89,860.86 from trading in silver straddles, and aggregate short-term losses of $ 475,000.64. Petitioner reported the difference between those amounts, $ 4,805.89, on the Schedule D, Capital Gains and Losses, attached to his joint 1980 Federal income tax return, as a short-term capital loss. Petitioner's account at Bache also recorded a long-term capital gain of $ 366,632.64, from trading in silver straddles, as described above. Petitioner reported that amount on his Schedule D for 1980 as a long-term capital gain. *233 In the notice of deficiency which is the subject of this proceeding, respondent determined for the year 1979 that petitioner was not entitled to deduct the losses of $ 565,534 realized from petitioner's trading in silver straddles. The notice of deficiency explains the reasons for respondent's determination as follows: It is determined that the gains and losses claimed by you in 1979 and 1980 with respect to commodity straddle transactions cannot be recognized because you have not established that the gains and losses occurred or occurred in the manner claimed. Further, the recognition of the claimed loss in 1979 would distort the economic reality of the entire transaction. No genuine loss occurred. The alleged loss was but one step in a series of integrated transactions, and the entire transaction lacked economic reality. Additionally, the claimed loss in 1979 is disallowed because of the lack of any profit motive with respect to the tax-straddle transaction. Moreover, the claimed loss is disallowed because it does not clearly reflect income.
If respondent had treated petitioner's 1980 return in a manner consistent with the above adjustment made for 1979, then respondent *234 would have removed the gains petitioner reported from his trading in silver straddles, $ 456,493.50, consisting of short-term gain of $ 89,860.86 and long-term gains of $ 366,632.64. However, as stated in the notice of deficiency, respondent chose to take an inconsistent position for 1980 "in order to protect the Government's interests". Respondent made two adjustments for 1980. First, respondent disallowed the deduction of the loss in the amount of $ 272,551.89 realized by petitioner on February 29, 1980, when he bought three contracts for May 1980 silver. Appendix A-2, position 11. Second, respondent eliminated the long-term capital gain of $ 366,632.64, described above, which petitioner had reported. Appendix A-2, position 11. These adjustments caused an increase of $ 36,746.47 in petitioner's taxable income for 1980. OPINION The Internal Revenue Code presently contains a comprehensive set of rules governing the tax treatment of straddle transactions. See secs. 263(g), 1092, 1256. These rules were first enacted by Congress in the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, secs. 501-509, 95 Stat. 172, 323-335, effective generally for property acquired and *235 positions established after June 23, 1981, in tax years ending after that date. These rules have been amended from time to time. See Technical Corrections Act of 1982, Pub. L. 97-448, secs. 105, 306, 311, 96 Stat. 2365, 2384-2387, 2403, 2411-2412; Deficit Reduction Act of 1984, Pub. L. 98-369, secs. 101-108, 98 Stat. 494, 616-631; Tax Reform Act of 1986, Pub. L. 99-514, sec. 1808, 100 Stat. 2817. Generally, the purpose of these rules is to prevent the use of straddles to defer the realization of income or to convert ordinary income and short-term capital gain into long-term capital gain. See Staff of Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 283 (J. Comm. Print 1981). As applicable to 1979 and 1980, the years in issue in this case, the Internal Revenue Code provided no comprehensive rules dealing with straddle transactions. In the case of a straddle involving commodity futures contracts, each of the contracts forming a leg of the straddle was subject to the same tax treatment as a single futures contract. That is, the taxpayer realized no gain or loss during the time he or she held an open futures contract. When the taxpayer *236 acquired an offsetting contract to close out a futures contract before it came due, then the taxpayer was treated as having sold or exchanged the original contract and the taxpayer realized a gain or loss at that time. See Vickers v. Commissioner, 80 T.C. 394 (1983); Covington v. Commissioner, 42 B.T.A. 601 (1940), affd. in part and revd. in part on another issue, 120 F.2d 768 (5th Cir. 1941). The amount of the gain or loss was determined by the difference between the price of the commodity under each offsetting contract. See sec. 1001. See generally Smith v. Commissioner, 78 T.C. 350 (1982). Since, in most cases, the taxpayer held the commodity futures contract as a capital asset, the gain or loss realized by the taxpayer on closing a futures contract was treated as a capital gain or loss. See sec. 1221; Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988); Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). See also section 1233(a), which provides that the gain or loss from the short *237 sale of property shall be capital gain or loss to the extent that the property used to close the short sale is a capital asset in the taxpayer's hands. Generally, during 1979 and 1980, gain or loss from the sale or exchange of a capital asset held for not more than 1 year was defined as short-term capital gain or loss, and gain or loss from the sale or exchange of a capital asset held for more than 1 year was defined as long-term capital gain or loss. Sec. 1222. However, a special rule changed the holding period "in the case of futures transactions in any commodity subject to the rules of a board of trade or commodity exchange". Under the special rule, if the taxpayer had held a commodity futures contract for more than 6 months, then the gain or loss was treated as long-term gain or loss. Sec. 1222, flush language. In the case of a short sale (within the meaning of section 1233) of a commodities futures contract, an apparent long-term gain realized on the closing of the short sale was considered to be short-term gain if "substantially identical property" to that used to close the sale had been held for not more than 6 months. Sec. 1233(b)(1). Similarly, an apparent short-term *238 loss realized on the closing of the short sale was considered to be a long-term loss if "substantially identical property" to that used to close the sale had been held for more than 6 months. Sec. 1233(d). In applying these rules, in the case of futures transactions in a commodity on a board of trade or commodity exchange, a commodity future requiring delivery in 1 calendar month was not considered as property substantially identical to another commodity future requiring delivery in a different calendar month. Sec. 1233(e)(2)(B). A taxpayer who realized a gain upon closing out a commodity futures contract generally was required to recognize the amount of the gain as income during the taxable year. See secs. 1001(c), 1222. On the other hand, if the taxpayer realized a loss in closing out a commodities futures contract, and the taxpayer was an individual, then the taxpayer was subject to the limitation on losses set forth in section 165(c). Under that provision, the deduction was limited to losses incurred in a trade or business, losses incurred in a transactions entered into for profit, though not connected with a trade or business, and losses which arose from fire, storm, shipwreck, *239 or other casualty, or from theft. Sec. 165(c). Prior to 1981 and the enactment of the statutory straddle rules mentioned above, many traders sought to use straddles consisting of commodities futures contracts as a tax-planning technique. This technique has been fully described in previous cases and we need not repeat that discussion here. See Miller v. Commissioner, 836 F.2d 1274, 1276-1277 (10th Cir. 1988), revg. 84 T.C. 827 (1985); Smith v. Commissioner, 78 T.C. 350, 363-365 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). Suffice it to say that the essential element of this technique involved closing the loss leg of a straddle and deducting the loss realized therefrom in 1 year, while deferring realization of the corresponding income from the gain leg until a later year. The Commissioner attempted to apply general tax principles to prevent taxpayers from using straddles of commodity futures to generate artificial losses and to convert short-term capital gains into long-term capital gains. See Rev. Rul. 77-185, 1977-1 C.B. 49. *240 For example, Rev. Rul. 77-185, supra, involved the following silver straddle transactions: Gain
Gain<Loss>
August 1, 1975:
<Loss>
Commission
Realized
Sell 40 lots July 76 at
$ 2,000x
Buy 40 lots March 76 at
1,951x
August 4, 1975:
Sell 40 lots March 76 at
$ 1,825x
<$ 126x>
<$ 2x>
<$ 128x>
Buy 40 lots May 76 at
1,851x
February 18, 1976:
Sell 40 lots May 76 at
$ 2,025x
$ 174x <$ 2x>
$ 172x Buy 40 lots July 76 at
2,051x
<   51x>
<$ 2x>
<$  53x>
<$   9x>
The Commissioner ruled that neither the short-term loss of $ 128x claimed by the taxpayer in 1975, nor the out-of-pocket loss of $ 9x arising in 1976 (i.e., $ 128x loss in 1975 and $ 119x gain in 1976) was deductible as a loss within the meaning of section 165(a). According to the ruling, the 1975 loss was not deductible because, after the switch on August 4, 1975, the taxpayer was in exactly the same balanced position as before these transactions, with the only difference being the month of delivery of the replacement contracts. Thus, the August 4 sale resulted in no real change of position in a true economic sense, and does *241 not represent a closed and completed transaction. [Id., 1977-1 C.B. at 50.]
According to the ruling, the economic loss of $ 9x realized in 1976 was not deductible because the "taxpayer had no reasonable expectation of deriving an economic profit from the transactions". Id.
The extensive straddle rules promulgated by Congress in ERTA were not intended to influence the resolution of cases involving pre-1981 tax straddles. Smith v. Commissioner, supra at 394. Accordingly, the Commissioner continued to pursue adjustments involving pre-1981 straddles. When Congress amended the straddle rules in 1984, it also sought to reduce the uncertainty applicable to pre-1981 straddles by enacting DEFRA section 108. H. Rept. 98-861 (1984), 1984-3 (Vol. 2) C.B. 1, 170-171. However, the effect of that provision on the deductibility of losses realized in a straddle transaction was the subject of several conflicting interpretations. Compare Miller v. Commissioner, 836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (1985) with Wehrly v. United States, 808 F.2d 1311, 1312 (9th Cir. 1986) *242 and Landreth v. Commissioner, 845 F.2d 828 (9th Cir. 1988), affg. T.C. Memo. 1986-242, vacated 859 F.2d 643 (9th Cir. 1988). Ultimately, Congress amended DEFRA section 108 in the Tax Reform Act of 1986, Pub. L. 99-514, section 1808(d), 100 Stat. 2817. As amended, subsections (a) and (b) of DEFRA section 108 provide as follows: SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981. (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. (b) Loss Incurred in a Trade or Business. -- For purposes of subsection (a), any loss incurred *243 by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.
Thus, for the years at issue, a taxpayer, other than a commodities dealer, is not eligible to deduct a loss on the disposition of a leg in a straddle, unless the taxpayer proves that the loss was incurred "in a transaction entered into for profit". DEFRA sec. 108. It is settled that to meet this requirement the taxpayer must establish that he or she entered into the straddle transaction primarily for profit. Ewing v. Commissioner, 91 T.C. 396, 416-417 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988). This is the standard historically applied under section 165(c)(2). Ewing v. Commissioner, supra at 417. In Ewing v. Commissioner, supra at 417-418, we noted that profit must be the taxpayer's primary motive in order for a loss from a particular straddle transaction to be deductible. In that case, we also set forth the following additional *244 guidelines taken from our opinion in Fox v. Commissioner, 82 T.C. 1001 (1984): (1) The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive. 82 T.C. at 1021. (2) Profit motive refers to economic profit independent of tax savings. 82 T.C. at 1022. (3) The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss. 82 T.C. at 1018, citing Smith v. Commissioner, 78 T.C. at 390-391. (4) If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent. 82 T.C. at 1022. (5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at *245 the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent. 82 T.C. at 1022. [Ewing v. Commissioner, supra at 417-418.]
In this case, there is no question but that when petitioner entered into his silver straddle transactions, they had the potential to generate real economic profits, independent of tax savings. On the first day after he established his straddle, petitioner had a possible, but unrealized, economic gain of $ 1,000. By September 19, 1979, petitioner's straddle had an available net economic gain of $ 31,000 -- if petitioner had decided then to liquidate his straddle. On October 11, 1979, his straddles reflected a net unrealized economic loss of $ 4,150, his first loss position. Petitioner did not recover an economic gain position. He finally closed out all silver straddle positions on February 29, 1980, with an economic loss of $ 107,300, exclusive of commissions. Petitioner emphasizes that if he had entered into the opposite transactions, i.e., if he had transposed his long and short contracts in maintaining his straddle, *246 he would have realized an economic gain in the amount of $ 107,300, exclusive of commissions. The potential unrealized gain of $ 31,000 and the ultimately realized loss of $ 107,300 show that when petitioner entered his straddle positions in 1979, there was a substantial potential for profits, as well as losses, on such transactions. Respondent, however, points to a number of objective factors relating to those straddles. Respondent contends that these factors, taken together, show that petitioner's primary intent in establishing the straddles was to save taxes, not to earn economic profits. Respondent first notes that petitioner justified his initial entry into the silver straddles by explaining that he hoped to profit from a near-term drop in the silver market. To do this, he established a short January/long March straddle. On the day he established his initial spread, however, petitioner also took an open long position in 10 silver contracts, due in December. Respondent argues that this open position is inconsistent with any expectation of a near-term drop in the silver market. As respondent views the matter, petitioner's open long position indicates that petitioner believed *247 the market would continue its upward climb, and not drop. Petitioner, in fact, realized gains on the open contract as the market continued its climb. Petitioner counters that he saw an aberration in the December 1979 contract price and used the open position to take advantage of that aberrational price until the market corrected itself. Between August 16 and August 31, 1979, petitioner opened and closed three long positions in December silver. These trades netted him $ 32,000, $ 15,000, and $ 23,000. He held none of these positions more than a few days before collecting his profits. As to his straddle positions, however, petitioner maintains they served a different purpose than his open positions. He established the straddles to achieve long-term profits, and not to take advantage of sporadic market fluctuations. Petitioner's explanation is credible. Predicting a price movement for 24 hours, or a few days, is much different than predicting price movements for an extended time period. The price of petitioner's open position in long futures contracts for December silver could certainly move up in the few days following their acquisition. At the same time, the price of the *248 short January silver contracts in his straddle could as surely move down during the following months. Daily prices in the commodities markets show up-and-down movements in a manner that does not affect the long-term trend of the markets. Respondent argues that, as a general matter, petitioner's months-long silver straddle holdings are inconsistent with his usual profit-motivated trading patterns. Petitioner's trading records show that he did not usually employ straddles. Instead, he usually employed short-term open positions in seeking to profit from the futures markets. Respondent concludes from this that petitioner used his long-term straddle position for tax purposes, and not economic profit. Petitioner has convinced us, however, that his reason for setting up the straddles was to achieve added security while trying to invest profitably in the turbulent silver markets. Petitioner's broker at Bache, Mr. Cochran, urged petitioner to trade in straddles as a safety measure. Petitioner considered this advice to be prudent. According to newspaper reports in the month before petitioner established his straddles, specialists in silver were "agog at the market's performance". *249 Another article, which appeared 3 weeks after petitioner established his straddles, states: "Chaos has struck the silver market". The article quotes experts who stated: "The market is out of control * * * people are really going to get hurt". Additionally, as noted above, in the last 2 weeks of August, petitioner made $ 60,000 by taking long open positions in the silver futures market. He held those positions for no more than 6 days -- sometimes for no more than 1 day. Notwithstanding these impressive profits, petitioner stopped trading in open silver futures contracts. His trading records at Bache show that, within 3 days of establishing his first silver straddle, petitioner traded only in silver straddles. His abandonment of the previously profitable open positions in silver indicates that petitioner would thereafter trade in the increasingly volatile silver markets only with the added security provided by silver straddles. Respondent's principal argument is that petitioner's trading patterns with respect to the straddles are consistent with a "classic silver tax straddle". Respondent reminds us that a rising market presents significant tax advantages for a trader in silver *250 straddles. Nevertheless, between September 4, 1979, and October 18, 1979, petitioner generated tax losses of more than $ 1.13 million when he established his March/May short straddle, then switched to a March/May/July short straddle, and then switched back again. These losses went a long way toward eliminating the otherwise taxable short-term capital gains of $ 718,927 that he had already earned by the end of August of that year, plus the several hundred thousands of dollars in short-term capital gains that he would earn by the end of the year. The same transactions also enabled petitioner to postpone substantial amounts of his unrealized gains into the next taxable year. Petitioner left the "long" leg, the March leg, undisturbed until December of 1979, when he began to reduce the number of his contracts. Some vestiges of this long leg persisted into 1980, when, after holding three long contracts for 6 months and 1 day, petitioner closed out his last silver positions for a gain of $ 366,632.64, taxable as a long-term capital gain. To reinforce the assertion that petitioner had engaged in a "classic" silver tax straddle, respondent presented an expert witness, Professor William *251 Mulvey of Princeton University. Professor Mulvey's report took note of the tax benefits produced by petitioner's straddle positions. His report also contains charts depicting petitioner's silver straddle positions. One such chart shows that petitioner could have closed out his straddle position at a gain during only the first 43 days of the 185 days in which petitioner held his silver straddles. Professor Mulvey prepared another chart showing the economic effects of the two "switch" transactions that generated $ 940,680 in losses during a period of 19 trading days. These transactions were petitioner's switch, on September 21, 1979, from the short March/May straddle to the short March/May/July straddle, and the switch back to the short March/May straddle 19 trading days later. Professor Mulvey's chart shows the economic effects of making such trades for each trading day of the 1-year period beginning in October of 1978 and ending with October of 1979. He explained that this chart shows that petitioner's switches would incur minor economic losses, some $ 3,328, while generating very substantial capital losses. On brief, respondent further argues that, despite petitioner's economic *252 loss of $ 109,040.55, he achieved tax savings for 1979 and 1980 of $ 277,818.92. These took the form of lowered capital gains taxes and the deferral of income into the 1980 taxable year. Thus, according to respondent, for the years 1979 and 1980, petitioner's silver straddles yielded a net gain, after taxes, of approximately $ 169,000. Respondent concludes that the large tax savings show that tax benefits, and not economic profit, were petitioner's motivating factors in establishing the silver straddles. In response to respondent's "classic silver tax straddle" demonstration, petitioner argues that he had no tax motivation in entering into the silver straddles at issue. In view of the substantial tax benefits generated by petitioner's silver straddles, we view his contentions with more than a little skepticism. Nevertheless, his testimony, plus other objective factors, indicates that profit was the primary motive driving petitioner's sequence of trades. Petitioner testified that in August of 1979 he believed the price of silver would drop before it made further significant gains. Petitioner believed that this market downturn would be short-lived. Therefore, the safest way *253 to profit would be to make an investment that would take advantage of the downturn, while at the same time it minimized potential losses from the later expected upturn in the market. He thought that the use of a long spread, i.e., short January silver and long March silver, would accomplish that objective. Accordingly, petitioner entered into his long straddle on August 28, 1979, as described above and in appendix A, position 01. Others apparently shared petitioner's expectations. On July 18, 1979, the Wall Street Journal had written of a "veteran silver analyst" who said "silver currently is overpriced. The important move from here is on the downside, not the upside". Contrary to the expectations of petitioner and of other people in the commodities market, silver prices continued their upward climb following petitioner's initial investment. By October 10, 1979, the Wall Street Journal wrote of "losers, * * * as sharp gains in commodity prices surprised many experienced professional traders". After the initial trades on August 28, 1979, petitioner testified that his next trades were in response to his belief that high-volume traders were planning to cause a squeeze in the *254 market in the early part of 1980. Consequently, on September 4, 1979, he replaced his January 1980 short leg with a May 1980 short leg, as described above and in appendix A, position 02. Again his beliefs are consistent with contemporary newspaper accounts. Reports in the Wall Street Journal told of rumors of a squeeze that had existed since August of 1979. An article which appeared on September 6, 1979, reported "rumors of manipulation". Another article which appeared on September 19, 1979, quoted a source as stating that the Comex Board feared a squeeze in the silver market. The Wall Street Journal later reported on October 26, 1979: "The possibility of a delivery squeeze, or a 'corner,' always brings near-panic to a commodities exchange, and the current silver boom is no exception". After acquiring his short May straddle, petitioner heard rumors that another high-volume trader, Mr. Henry Jarecki, had acquired a significant May short position that he would not be able to cover in the event of a squeeze. Since petitioner was also short in May silver, he would have suffered a significant loss if this were to occur. Petitioner therefore decided to limit his risk. He made trades *255 on September 21, 1979, to switch 30 of the 40 contracts in his short position from May 1980 to July 1980, hoping to avoid a potential squeeze on the market in May. See appendix A, position 03. Petitioner then learned that Mr. Henry Jarecki had averted the potential squeeze in May 1980 by arranging a deal to cancel his May short position. The Wall Street Journal reported on October 10, 1979, that Mr. Jarecki considered himself as "fat, happy, and still making money". A few days later, on October 18, 1979, petitioner went back to the March/May short positions. See appendix A, position 04. Because of the rise in the silver market during the last 3 months of 1979, petitioner's losses continued to mount. By December, he was losing more on his short May leg than he was gaining on his long March leg. Higher margin demands seemed imminent. Petitioner began to reduce his positions. He sought to limit future losses while still keeping alive the possibility of substantial gains from the anticipated squeeze. Early in 1980, however, petitioner closed out his remaining positions in the silver futures market because of the possible delivery of the commodity and the substantial attendant *256 costs. Although there were tax savings from these transactions, we conclude, on the above facts, that petitioner's primary motivation was to make an economic profit in the silver futures market. We view petitioner's tax savings against his overall trading strategy for 1979. He was a highly successful commodities trader. By August of that year, he had already made a profit of more than $ 600,000 in agricultural commodities; later that month, he made $ 69,000 in open silver trades. His plan to take advantage of a "squeeze" in the turbulent silver markets of 1979 was generally consistent with his speculator's approach. While his tax savings enabled him to come out some $ 169,000 ahead on his silver straddles, we believe that he was after far larger returns in economic profits. Petitioner's testimony of his stated motivation behind each trade or series of trades was credible and supported by contemporaneous reputable news articles. Moreover, some of petitioner's trades are inconsistent with tax motivations. For example, his silver straddles generated $ 1.13 million in short-term capital losses during September and October, well before the end of the tax year, and well before *257 he knew how much in terms of capital losses he would need for tax purposes. Additionally, petitioner's last trade took place on December 28, 1979, when he liquidated three lots from both his long and short legs, and generated a gain of $ 133,740, before commissions. He paid taxes on most of this, reporting a net short-term capital gain for 1979 of $ 101,000. If petitioner had invested in his silver straddles primarily for tax benefits, we believe that he would have deferred this gain until a few day later, when it would have been taxable in 1980. Nothing in Professor Mulvey's report convinces us that tax considerations primarily motivated petitioner's trading in straddles. The report shows that, during most of the time that petitioner held his silver straddles, their indicated value would have produced a loss upon liquidation. Petitioner's goal, however, was not to maintain a profitable position each day he held his straddles. Rather, petitioner's principal goal was to take advantage of an anticipated, and well-publicized, potential "squeeze" in the silver markets. We note that at trial, Professor Mulvey admitted that if one of the Hunt brothers had cornered the silver market *258 in late February, and if there had been a squeeze in March 1980 as petitioner had predicted, then in mid-February of 1980 petitioner "would have made money on that obviously". Nor is there much persuasive in Professor Mulvey's chart showing the limited economic potential of petitioner's switch from his short March/May straddle to March/May/July and back again. Professor Mulvey's chart tracks the months from October of 1978 to October of 1979. That was a period of relative calm on the silver markets, at least when compared to the months that followed. Petitioner, however, did not trade any silver futures at all during the first relatively tranquil 11 months of Professor Mulvey's chart. Petitioner's straddle ownership coincides with Professor Mulvey's chart only on some 33 days, from August 28, 1979, through the end of September 1979. That was only a fraction of the time period involved. Petitioner held his straddles for another 152 days beyond the period included in Professor Mulvey's chart. For the most part, this was a period of extreme volatility. Accordingly, because Professor Mulvey's chart does not address most of the period in which petitioner maintained his silver *259 straddles, we do not find it particularly helpful. Finally, we decline to hold that petitioner's silver straddles were not profit motivated merely because he made more in tax savings than he lost in trading. Here, as we observed in another case, regarding profit motive in commodities trading: Petitioner does not acknowledge any tax motivation, and respondent is relying solely on the results of the transactions, arguing that petitioner's trading was not rational in the absence of anticipated tax consequences. Unlike respondent, however, we will not ignore petitioner's testimony, the possibility of profits if his market opinions proved correct, the credibility of rapidly changing market positions in an extremely volatile market, and the propriety and necessity of minimizing, or hedging, risks in petitioner's business. We are persuaded that petitioner's primary purpose in engaging in options transactions, spread transactions, butterflies, and specifically the transactions in issue, was consistent with and part of his overall portfolio strategy to make a profit.
Laureys v. Commissioner, 92 T.C. 101, 133-134 (1989). Petitioner has persuaded *260 us that he entered into the silver straddles at issue primarily for profit. We therefore conclude that he properly reported his gains and losses from the commodity trading activities at issue herein. In view of the foregoing, Decision will be entered for petitioners. APPENDIX A TRANSACTIONS IN ISSUE ENTERED INTO BY PETITIONER DURING 1979 Delivery
Commodity
Date
Prompt
STD
Basis Price
Position
(M-D-Y) Description
Line
Date
Lots or Price (a) (b) (c)
(d) (e) (f)
(g)
01
08-28-79
Sold Silver
1
Jan 80
40
$ 1035.00
08-28-79
Bought Silver
2
Mar 80
40
1051.30
02
09-04-79
Bought Silver
3
Jan 80
40
1132.00
09-04-79
Sold Silver
4
May 80
40
1155.20
03
09-21-79
Bought Silver
5
May 80
30
1635.60
09-21-79
Sold Silver
6
Jul 80
30
1645.00
04
10-18-79
Sold Silver
7
May 80
30
1769.50
10-18-79
Bought Silver
8
Jul 80
30
1791.00
05
12-17-79
Sold Silver
9
Mar 80
5
2321.00
12-17-79
Sold Silver
10
Mar 80
5
2321.50
12-17-79
Bought Silver
11
May 80
10
2360.00
06
12-18-79
Bought Silver
12
May 80
12
2454.50
12-18-79
Sold Silver
13
Mar 80
12
2410.50
07
12-28-79
Sold Silver
14
Mar 80
2
2798.00
12-28-79
Sold Silver
15
Mar 80
2
2799.00
12-28-79
Bought Silver
16
May 80
4
2848.00
*261 Summary Amount
Increase
Commission
From
From
Gain
Position
(Decrease)
Amount
(line)
Column (h)
(Loss)
(a) (h) (i) (j) (k) (l) 01
$ 2070000 $    X
$    $    (2102600)
X
02
(2264000)
690.00
1
2070000 (194000)
2310400 X
03
(2453400)
517.50
4
1732800 (720600)
2467500 X
04
2654250 X
(2686500)
562.50
6
2467500 (219000)
05
580250 2
(262825)
317425 580375 187.50
2
(262825)
317550 (1180000)
187.50
4
577600 (602400)
06
(1477700)
243.00
7
1061700 (411000)
1446300 225.00
2
(630780)
815520 07
279800 2
(105130)
174670 279900 75.00
2
(105130)
174770 (569600)
81.00
7
353900 (215700)
1979
(562765)
Column
Description
(a)
Numbers the discrete positions adopted
(b)
Date of the transaction
(c)
Description of the position
(d)
Line identifier
(e)
Contract delivery month and year
(f)
Number of contracts traded at 5,000 ounces per contract
(g)
Price per ounce in cents, i.e., 1035.00 = $ 10.35/ounce
(h)
Value of contract, excluding commissions
(i)
Cost of commissions
(j)
For closing transactions, identifies
the line on which the position was opened
(k)
Original value of opening contract
(l)
Realized profit or loss on the closing transaction
(excluding commissions)
*262 APPENDIX A-2 TRANSACTIONS IN ISSUE ENTERED INTO BY PETITIONER DURING 1980 Delivery
Commodity
Date
Prompt
STD
Basis Price
Position
(M-D-Y) Description
Line
Date
Lots or Price (a) (b) (c) (d) (e) (f)
(g)
08
01-24-80
Sold Silver
17
Mar 80
4
4050.00
01-24-80
Bought Silver
18
May 80
4
4065.00
09
02-20-80
Sold Silver
19
Mar 80
4
3411.00
02-20-80
Bought Silver
20
May 80
4
3485.00
10
02-25-80
Sold Silver
21
Mar 80
3
3270.00
02-25-80
Bought Silver
22
May 80
3
3365.00
11
02-29-80
Sold Silver
23
Mar 80
3
3496.00
02-29-80
Bought Silver
24
May 80
3
3586.00
Summary Amount
Increase
Commission
From
From
Gain
Position
(Decrease)
Amount
(line)
Column (h)
(Loss)
(a) (h) (i) (j) (k) (l) 08
810000 96.48
2
(210260)
599740 (813000)
102.52
7
353900 (459100)
09
682200 96.48
2
(210260)
471940 (697000)
102.52
7
353900 (343100)
10
490500 72.36
2
(157695)
332805 (504750)
76.89
7
265425 (239325)
11
524400 72.36
2
(157695)
366705 (537900)
76.89
7
265425 (272475)
1980 457190 Column
Description
(a)
Numbers the discrete positions adopted
(b)
Date of the transaction
(c)
Description of the position
(d)
Line identifier
(e)
Contract delivery month and year
(f)
Number of contracts traded at 5,000 ounces per contract
(g)
Price per ounce in cents, i.e., 1035.00 = $ 10.35/ounce
(h)
Value of contract, excluding commissions
(i)
Cost of commissions
(j)
For closing transactions, identifies the line
on which the position was opened
(k)
Original value of opening contract
(l)
Realized profit or loss on the closing transaction
(excluding commissions)
*263 APPENDIX B Petitioner's Daily Net Economic Position Amount
Date (Month/Day/Year)
0
08/28/79
1000
08/29/79
1000
08/30/79
4600
08/31/79
4600
09/04/79
4600
09/05/79
4600
09/06/79
7600
09/07/79
12600
09/10/79
12600
09/11/79
12400
09/12/79
11000
09/13/79
11000
09/14/79
11000
09/17/79
11000
09/18/79
31000
09/19/79
10600
09/20/79
18600
09/21/79
16600
09/24/79
6350
09/25/79
8100
09/26/79
8100
09/27/79
6800
09/28/79
6800
10/01/79
6350
10/02/79
9850
10/03/79
9850
10/04/79
9850
10/05/79
1100
10/08/79
1100
10/09/79
1100
10/10/79
-4150
10/11/79
-7650
10/12/79
-11150
10/15/79
-11150
10/16/79
-25150
10/17/79
-58400
10/18/79
-48400
10/19/79
-50400
10/22/79
-51400
10/23/79
-53400
10/24/79
-50400
10/25/79
-50400
10/26/79
-50400
10/29/79
-45400
10/30/79
APPENDIX B-2 Petitioner's Daily Net Economic Position Amount
Date (Month/Day/Year)
-45400
10/31/79
-45400
11/01/79
-43400
11/02/79
-46400
11/05/79
-47400
11/06/79
-46800
11/07/79
-46000
11/08/79
-45400
11/09/79
-45400
11/12/79
-45400
11/13/79
-45400
11/14/79
-47400
11/15/79
-48400
11/16/79
-48400
11/19/79
-48400
11/20/79
-55400
11/21/79
-49400
11/23/79
-54400
11/26/79
-54400
11/27/79
-54400
11/28/79
-54400
11/29/79
-54400
11/30/79
-54400
12/03/79
-53400
12/04/79
-55000
12/05/79
-54400
12/06/79
-52400
12/07/79
-46400
12/10/79
-53400
12/11/79
-55400
12/12/79
-55400
12/13/79
-68400
12/14/79
-77400
12/17/79
-77400
12/18/79
-82800
12/19/79
-80550
12/20/79
-80550
12/21/79
-80550
12/26/79
-80550
12/27/79
-80550
12/28/79
-80550
12/31/79
-80550
01/02/80
-80550
01/03/80
-80550
01/04/80
-80550
01/07/80
*264 APPENDIX B-3 Petitioner's Daily Net Economic Position Amount
Date (Month/Day/Year)
-85450
01/08/80
-85450
01/09/80
-85450
01/10/80
-85450
01/11/80
-85450
01/14/80
-85450
01/15/80
-85450
01/16/80
-85450
01/17/80
-85450
01/18/80
-85450
01/21/80
-85450
01/22/80
-85450
01/23/80
-85450
01/24/80
-85450
01/25/80
-85450
01/28/80
-85450
01/29/80
-85450
01/30/80
-85450
01/31/80
-85450
02/01/80
-85450
02/04/80
-85450
02/05/80
-85450
02/06/80
-85450
02/07/80
-85450
02/08/80
-85450
02/11/80
-95450
02/12/80
-95450
02/13/80
-102950
02/14/80
-102950
02/15/80
-102950
02/19/80
-102950
02/20/80
-101450
02/21/80
-101450
02/22/80
-105950
02/25/80
-105125
02/26/80
-105050
02/27/80
-93800
02/28/80
-107300
02/29/80